IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| RACHEL RAAK LAW and MICAH BROEKEMEIER, individuals, | Case No. 4:22-CV-00176-SMR-SHL |
| Plaintiffs, | |
| v. | **Defendant's Resistance to Plaintiffs' Motion for Preliminary Injunction** |
| ROBERT GAST, in his official capacity as State Court Administrator for the Iowa Judicial Branch, | |
| Defendant. | |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................. 2

FACTUAL BACKGROUND ................................................................ 3

LEGAL STANDARD FOR PRELIMINARY INJUNCTION ............ 7

ARGUMENT ....................................................................................... 9

   I. Plaintiffs are unlikely to succeed on the merits of their claims because section 46.2 does not impose differential treatment and because, even if it does, it is substantially related to achieving important governmental objectives. ......................................... 9

      A. Men and women have equal opportunities to serve on the State Judicial Nominating Commission. ................................................. 9

      B. Even if intermediate scrutiny applies, success is unlikely because the gender-balance statute serves several substantial interests. .................................................................................... 12

  II. The other *Dataphase* factors don't support upsetting the status quo by enjoining a duly enacted statute that has been in effect for 35 years and continues to serve important state interests. ....................... 16

CONCLUSION .................................................................................. 19

**INTRODUCTION**

The people of Iowa have entrusted the State Judicial Nominating Commission with evaluating the lawyers who apply to serve as judges or justices on Iowa's appellate courts and nominating the best applicants for consideration of appointment by the Governor. *See* Iowa Const. art. V, §§ 15–16. And to ensure the Commission effectively performs this duty with the confidence of all Iowans, Iowa law requires geographic and gender balance of commissioners. *See* Iowa Code §§ 46.1(3), (5), 46.2(1). Nine commissioners are appointed by the Governor; eight are elected by Iowa lawyers in elections held every two years for staggered six-year terms. Iowa Code §§ 46.1–.2. So in each of Iowa's four congressional districts, once every six years, the lawyers elect a woman; once, they elect a man; and once, they have no election. In sum, this means the lawyers elect four men and four women.

Plaintiffs claim they want to be elected to serve on the Commission. Raak Law is a woman living in Iowa's fourth congressional district, which elected a woman in 2019 and will be electing a man in the next election in 2023. And Plaintiff Micah Broekemeier is a man in the first congressional district, which elected a man three years ago and will be electing a woman in 2023. So neither is eligible to seek election from their districts right now. But nothing prevents them from seeking election from a different district—each other's district, for example—or waiting until they would next be eligible for election from their "home" districts in 2025.

They sue—and ask for a preliminary injunction—to enjoin enforcement of the gender-balance requirement for elected commissioners so they can be listed on the ballot for the upcoming elections in their respective "home" districts in January 2023. They argue that the requirement of equal balance of men and women is a violation of the Equal Protection Clause. But they are not

likely to succeed on their claim. And this dooms their request for a preliminary injunction.

For starters, the gender-balance requirement for elected state commissioners does not violate the Equal Protection Clause because it doesn't discriminate against men or women—they are provided *equal* opportunities to serve on the State Judicial Nominating Commission. But even if the gender-balance requirement is gender-based discrimination subject to intermediate scrutiny, it is substantially related to important state interests. These include remedying past unequal election of women to the Commission—indeed *no* woman had ever been elected before the challenged statute—improving the quality and integrity of the Commission deliberations, fostering diversity in the merit selection process, and maintaining public confidence in the selection and legitimacy of Iowa's courts.

Today, women are still outnumbered nearly two-to-one by men in the Iowa bar. Critelli Dec., Doc. 20-2, ¶ 6. And the State's other interests remain just as important as in 1987. So even if it would be appropriate to end the gender-balance requirement someday, today is not that day. The Court should deny Plaintiffs' motion for preliminary injunction.

## FACTUAL BACKGROUND

In 1962, the people of Iowa ratified a constitutional amendment altering the State's method of selecting judges. *See* Iowa Const. amd. 21. The amendment replaced partisan elections with an appointment process in which the Governor appoints judges from a slate of nominees approved by a judicial nominating commission. *See id.*; *see also* Iowa Const. art. V, § 15.

Nominees for the Supreme Court are selected by the State Judicial Nominating Commission. *See* Iowa Const. art. V, § 16. The Constitution sets only a few fixed requirements for the makeup of the Commission. *Id.* It requires

commissioners to be chosen with "due consideration" to "area representation" and "without reference to political affiliation." *Id.* It requires Commissioners to serve staggered, six-years terms. *Id.* And it prohibits commissioners from holding an "office of profit of the United States or the state during their terms" or from serving a second full term on the Commission. *Id.*

The Constitution also set the default composition of the Commission that was mandatory until July 4, 1973—but could be altered by the Legislature thereafter. *See id.* Under this initial composition, nearly half of the commissioners were appointed by the Governor, subject to confirmation by the Senate. An equal number were elected by the resident members of the Iowa bar. And the final commissioner—the Chair—was the senior justice of the Iowa Supreme Court who is not the Chief Justice. The Legislature kept this general structure until 2019, when it removed the senior justice and added one additional appointed commissioner so that the Governor appointed a simple majority of the Commission. *See* Act of May 8, 2019, ch. 89, §§ 46, 50, 2019 Iowa Acts 302, 311–13.

From the beginning, the Legislature implemented the Constitution's requirement for geographic diversity by tying appointments and elections to Iowa's congressional districts. But originally, the Legislature did not attempt to ensure gender diversity on the Commission. And from the first election in 1962 until 1988, no woman was ever elected by Iowa's attorneys to serve on the State Commission. Gast Dec., Doc. 20-1, ¶ 10.

Women made up about 50% of the Iowa population throughout this time. *See* U.S. Dep't of Commerce Bureau of the Census, *General Population Characteristics: Iowa*, Tbl. 17,  at 17-25, *available at* https://www2.census.gov/library/publications/decennial/1980/volume-1/iowa/1980a_iaabc-02.pdf   (showing women were 50.7% of the population in 1960, 51.3% in 1970, and 51.4% in

1980). Indeed, they still do. *See* U.S. Census Bureau*, ACS Demographic and Housing Estimates 2020*, https://data.census.gov/cedsci/table?t=Age%20and% 20Sex&g=0400000US19&y=2020&tid=ACSDP5Y2020.DP05 (showing women are 50.3% of Iowa population in 2020). But the percentage of female lawyers was much smaller. Nationally women made up 2.6% of all lawyers in 1960 and grew to only 8.1% in 1980. Barbara A. Curran, *American Lawyers in the 1980s: A Profession in Transition*, 20 Law & Society Rev. 19, 25 (1986), *available at* http://www.jstor.com/stable/3053411. According to the best Iowa data available, by 2000, women still made up only 22.98% of Iowa resident lawyers. Critelli Dec., Doc. 20-2, ¶¶ 4, 5, 7.

In 1987, the Legislature addressed this lack of gender diversity among elected commissioners by mandating that commissioners be balanced among men and women. *See* Act of June 7, 1987, ch. 218, § 2, 1987 Iowa Acts 364, 364 (codified at Iowa Code § 46.2 (1989)). At the time, each congressional district only elected one commissioner, so the statute mandated that the district alternate between electing a man or a woman to the commission. *See id.*; *see also Meland v. Weber*, No. 2:19-cv-02288-JAM-AC, 2021 WL 6118651, at *8 (E.D. Cal. Dec. 27, 2021) ("The legislature determined that the law was necessary because the glass ceiling had been bolted shut with metal, shutting out . . . qualified women.").

The statutes governing the election of lawyers to the Commission was most recently amended in 2019. *See* Act of May 8, 2019, ch. 89, §§ 47, 51–56, 2019 Iowa Acts 302, 312–15. While the amendments made many substantial changes, the Legislature reaffirmed the gender-balance requirement. *See id.* § 47 (codified at Iowa Code § 46.2(1) (2021)). Under the current statute, nine commissioners are appointed by the Governor, and "[n]o more than a simple majority" of those commissioners can "be of the same gender." Iowa Code

§ 46.1(3); *see also id.* § 46.1(1). Eight commissioners are elected by Iowa lawyers. *See id.* § 46.2. The lawyers in each of Iowa's four congressional district elect two of the commissioners—who must be "of different genders." *Id.* § 46.2(1). But because of the staggered six-year terms held every two years, *see id.* § 46.2(2); Gast. Dec., Doc. 20-1, ¶ 4, this means that in each of the districts, once every six years, the lawyers elect a woman; once, they elect a man; and once, they have no election.

While the voters and nominators must reside in the congressional district, Iowa law does not require the eligible elector seeking election to reside in the district. *See* Iowa Code §§ 46.2(1), 46.10(1); *see also* Iowa Code § 46.4 (adding the requirement that *district* commissioners must be "eligible electors of the district," rather than merely "eligible electors" as for the state commissioners in section 46.2(1)); Act of May 8, 2019, ch. 89, § 47, 2019 Iowa Acts 302, 312 (striking a prior version of the section in the 2019 Iowa Code that required state commissioners to also be of the congressional district).

Plaintiff Rachel Raak Law is woman who resides in Woodbury County, a part of the new fourth congressional district. Raak Law Dec., Doc. 17, ¶¶ 2–3. She's not a lawyer. Critelli Dec., Doc. 20-2, ¶ 8. But she wants to be on the ballot when the lawyers of her congressional district elect a replacement for John Gray, a male lawyer whose term on the Commission expires in 2023. Raak Law Dec., Doc. 17, ¶ 5; Gast Dec., Doc. 20-1, ¶ 4. Because the lawyers of her district elected a female lawyer three years ago in 2019, only men are eligible to run in this 2023 election. Gast Dec., Doc. 20-1, ¶ 5–6.

Similarly, Plaintiff Micah Broekemeier is a man who resides in Johnson County, a part of the new first congressional district. Broekemeier Dec., Doc. 18, ¶¶ 2–3. He's also not a lawyer. Critelli Dec., Doc. 20-2, ¶ 8. And he wants to be on the ballot when the lawyers of his district elect a replacement for

Dorothy O'Brien, a female lawyer whose term also expires in 2023. Broeke-meier Dec., Doc. 18, ¶ 5; Gast Dec., Doc. 20-1, ¶ 4. The lawyers in Broekemei-er's district elected its male commissioner in 2019 and will not do so again until 2025. So in 2023, only women are eligible to be nominated for election to the Commission. Gast Dec., Doc. 20-1, ¶ 5–6.

Despite their interest in serving on the State Commission, neither Plain-tiff has submitted a nominating petition with ten signatures of eligible electors to the State Court Administrator as required by Iowa law. Gast Dec., Doc. 20-1, ¶ 9. Nor have they asked for a nominating petition form from the Adminis-trator. *Id.* And though there are *four* impending appointed-commissioner va-cancies for Governor Reynolds to fill on the Commission before January 2023—and Raak Law was even previously appointed to serve on a district nominating commission—they only seek the unlikely possibility of being elected by the law-yers of their districts. *See* Mtn. for Prelim. Injunction, Doc. 16; Raak Law Dec., Doc. 17, ¶ 3; S. Journal, 2022 Reg. Sess., 89th Gen. Assemb., at 908–911, 936–37, *available at* https://www.legis.iowa.gov/docs/publications/SJNL/20220524 _SJNL.pdf.

So they now seek a preliminary injunction enjoining the State Court Ad-ministrator from enforcing the gender-balance requirements of Iowa law that would require them either to wait until 2025 to seek election to the Commission in the districts where they reside; to seek election in 2023 in a district other than the one where they reside; or to pursue earlier membership through the appointment rather than the election process. *See* Mtn. for Prelim. Injunction, Doc. 16.

## LEGAL STANDARD FOR PRELIMINARY INJUNCTION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The power

to grant a preliminary injunction has been called "an awesome power" that "necessarily requires the Court to analyze the record carefully to determine whether Plaintiff has shown that it will be irreparably harmed absent the issuance of the requested relief." *Mediacom Communications Corp. v. Sinclair Broad. Group, Inc.*, 460 F. Supp. 2d 1012, 1017 (S.D. Iowa 2006).

Courts in the Eighth Circuit apply a four-part test—generally called the *Dataphase* factors—to determine whether preliminary injunctive relief is appropriate. *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485–86 (8th Cir. 1993) (citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (1981) (en banc)). The four *Dataphase* factors are: "(1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of an injunction is in the public interest." *Id.* Ordinarily, "[n]o single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994).

But when a preliminary injunction seeks to "enjoin the implementation of a duly enacted state statute," a district court must "make a threshold finding that a party is likely to prevail on the merits." *Planned Parenthood Minn., N.D. v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc). Only if a plaintiff makes this threshold showing should the court "then proceed to weigh the other *Dataphase* factors." *Id.* at 732. This "more rigorous standard" is intended "to ensure that preliminary injunctions that thwart a state's presumptively reasonable democratic processes are pronounced only after an appropriately deferential analysis." *Id.* at 733.

## ARGUMENT

**I.    Plaintiffs are unlikely to succeed on the merits of their claims because section 46.2 does not impose differential treatment and because, even if it does, it is substantially related to achieving important governmental objectives.**

"[C]lassifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren*, 429 U.S. 190, 197 (1976). But that word "classification" can't be glossed over. It means "differential treatment," *United States v. Virginia*, 515 U.S. 515, 532–33 (1996), or employing discriminatory means, *see Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). But section 46.2, taken as a whole, does neither. It does not draw a classification *between* women and men, does not treat them differently, and does not discriminate against either gender. It expressly holds them equal. Therefore, heightened scrutiny does not apply, and Plaintiffs are unlikely to succeed because a rational basis supports the statute.

But even if heightened scrutiny applies, Plaintiffs are still unlikely to succeed. Numerous important governmental objectives support section 46.2—including remedying past unequal election of women to the Commission, improving the quality and integrity of the Commission deliberations, fostering diversity in the merit selection process, and maintaining public confidence in the selection and legitimacy of Iowa's courts.

**A.    Men and women have equal opportunities to serve on the State Judicial Nominating Commission.**

At the outset, Plaintiffs' Equal Protection challenge is unlikely to succeed because section 46.2(1) does not treat men and women differently. The challenge thus fails at a threshold step. "In the context of gender-based discrimination, the U.S. Supreme Court has interpreted th[e] clause to mean that unless a government actor can meet the 'demanding' burden of showing an

'exceedingly persuasive' justification *for treating males differently from females*, the differential treatment is unconstitutional." *D.M. v. Minn. State High Sch. League*, 917 F.3d 994, 1001 (8th Cir. 2019) (quoting *Virginia*, 518 U.S. at 533) (emphasis added). But section 46.2 does not treat males differently from females.

Both men and women can serve as members elected by the lawyers of each congressional district. They must simply await the staggered time at which that position is up for election. *See* Iowa Code §46.2(2) (requiring staggered terms and providing that terms for "no more than three of the commissioners shall expire within the same two-year period"). The result of Iowa Code chapter 46 is that voting lawyers elect eight commissioners: four men and four women. Neither gender is favored; neither is disfavored. The statute does not draw any eligibility classification on its face, and the only classification that occurs—administering elections such that the eligible voters in a particular district may only get to elect one commissioner in a given year—is necessary to carry out the statutory staggered terms.

With full understanding of chapter 46's framework, Plaintiffs' complaint loses most of its urgency. Plaintiffs' complaint here is really that they are precluded from seeking election (1) in 2023, (2) by the eligible voters in the respective congressional district where Plaintiffs reside—not that they are precluded from seeking election *forever* because of their gender. Plaintiffs could have run for the respective elective openings in the districts where they reside in 2019, and can do so in 2025 after the six-year term expires. *See* Iowa Code § 46.2(2). A statute that merely requires a little patience (because it otherwise operates equally) is not a constitutional affront. Even more, nothing prevents them from seeking election from a different district electing their gender, such as each other's districts.

The Washington Supreme Court upheld a materially similar statute, which required that two positions on a state political party committee be gender balanced, against a constitutional challenge under that state's Equal Rights Amendment. *See Marchioro v. Chaney*, 582 P.2d 487, 493 (Wash. 1978). In *Marchioro*, the plaintiffs asserted a similar "deprivation" of the "right to run for a position on the state committee." *Id.* at 492. They contended they were unlawfully excluded from running for a position on the committee because of a statute that required gender balance. But the Washington Supreme Court rejected the argument, because it concluded a constitutional provision meant to guarantee equality would not invalidate a state statute that *already* operated equally:

> The legislature has found that in the conduct of the offices of state committees there shall be an absolute equality of rights between the sexes. An equal number of both sexes must be elected to the committee . . . . Neither sex may predominate. Neither may discriminate or be discriminated against. There is an equality of numbers and an equality of rights to be in office and to control the affairs of the committee. The ironic result of plaintiffs' theory would be to abolish a statute which mandates equality by invoking a provision of the constitution passed to guarantee equality.
>
> The major objection of plaintiffs seems to be the mandate by statute that one of the positions on the state committee from each county is reserved for a female and the other for a male and that this violates the equal rights amendment. *But if the statute simply said, "The state committee of each major political party shall be composed of an equal number of women and men" there clearly would be no abridgment* or denial on account of sex of any equality of rights under the law.

*Id.* (emphasis added). Chapter 46 operates in exactly this fashion: it provides that the elected membership of the state judicial nominating commission shall

contain an equal number of women and men. There is no abridgment or denial on account of sex.[1]

Furthermore, because the state judicial nominating commission has a "narrow function" and a "disproportionate effect on a definable group of constituents," the United States Court of Appeals for the Eighth Circuit has held that for purposes of evaluating a "one person, one vote" equal protection challenge to the process of filling the elective commissioner positions, "Iowa must only show its system of election . . . is rationally related to Iowa's legitimate interests." *Carlson v. Wiggins*, 675 F.3d 1134, 1141 (8th Cir. 2012). Although this case is asserting a right to *be on* the ballot rather than a right to vote *with* that ballot (as in *Carlson*), there is room to conclude under *Carlson* that judicial selection methods nevertheless deserve special deference in any sort of equal protection analysis.

### B.   Even if intermediate scrutiny applies, success is unlikely because the gender-balance statute serves several substantial interests.

Plaintiffs' likelihood-of-success argument hinges predominantly on one case: *Back v. Carter*, 933 F. Supp. 738 (N.D. Ind. 1996). In *Back*, the Indiana district court enjoined a statute that (1) increased membership on a nominating commission; (2) mandated that the eight non-judge commissioners be gender balanced; (3) mandated that at least two members be racial minorities; and (4) ended all existing commissioners' terms, even if their term had tenure remaining, and required new elections. *See Back*, 933 F. Supp. at 746–47, 762–

---

[1] Although an Iowa Attorney General opinion is not binding on this Court, a published opinion from 1992 concluded that a proposed Iowa equal rights amendment would not invalidate a corollary gender balance statute, Iowa Code section 69.16A, which generally applies to membership on appointive state boards and commissions.  Op. No. 92-10-6, 1992 WL 470369, at *3 (Iowa Att'y Gen. Oct. 28, 1992).

63. The fourth requirement of the law ended Back's service as a previously elected commissioner "in September 1995, rather than in 1997 as originally expected*," id*. at 747, which constituted his Article III injury*, see id*. at 749.

Although the court enjoined the statute, it did so in part because the defendants' proof was lacking. Significantly, it acknowledged that the State "can show an important interest by showing societal discrimination in the relevant field." *Id.* at 757. It further acknowledged that if female "attorneys constituted twenty percent [of the bar] at all times and none were ever elected, there might be some cause for concern," but faulted the defendants for not presenting "any direct evidence of gender-based discrimination" to that effect. *Id.* at 758.

That's where this case is different. Official government publications indicate that from 1963 (when the state judicial nominating commission was first established and staffed) until 1987 (when chapter 46's gender balance requirement was enacted), all elected commissioners in Iowa were men. Gast Dec., Doc. 20-1, ¶ 10. And data kept by the Office of Professional Regulation for the last two decades indicates that women both were and are underrepresented in the bar compared to their percentage in the general population. Critelli Dec., Doc. 20-2, ¶¶ 5–7; *See* U.S. Dep't of Commerce Bureau of the Census, *General Population Characteristics: Iowa*, Tbl. 17,    at 17-25, *available at* https://www2.census.gov/library/publications/decennial/1980/volume-1/iowa/ 1980a_iaabc-02.pdf (showing women were 50.7% of the population in 1960, 51.3% in 1970, and 51.4% in 1980). This discriminatory *effect* of the non-gender-balanced election regime justifies the gender balance requirement, which remedies past unequal election of women.

But that's not the only important government interest the gender balance statute serves. It also aims to improve the quality and integrity of the

Commission deliberations, foster diversity in the merit selection process, and maintain public confidence in the selection and legitimacy of Iowa's courts. Professor Rachel Paine Caufield, an expert on the implementation of merit selection and other judicial selection systems, explains why each of these interests are important. Caufield Dec, Doc. 20-3, ¶¶ 6–7. For example, one benefit of gender balance is that a lesser percentage of women on the commission could be viewed as mere tokenism—which does not sway public confidence in decisionmaking and legitimacy. Caufield Dec., Doc. 20-3, ¶ 6. This was a notable data point for a California federal court that denied an injunction against an analogous California statute requiring female membership on many corporate boards. *See Meland*, 2021 WL 6118651, at *7 (crediting "empirical research supporting the idea that a critical mass of women is required and that any number below risks creating a token factor"). It's persuasive here too.

Another case from the 1990s illustrates why an equal protection challenge to a gender balance statute depends in large part on the evidence presented. In *Mallory v. Harkness*, a Florida federal court addressed a statute that required one (of three) judicial nominating commissioners appointed by the state bar to be "a member of a racial or ethnic minority group or a woman." *Mallory v. Harkness*, 895 F. Supp. 1556, 1558 (S.D. Fla. 1995) (quoting Fla. Stat. § 43.29(1)(a)). The court found no substantial justification for this "one in three" requirement because it discerned no prior discrimination *by the Commission* when screening judicial applicants. *See id.* at 1559. Thus, *Mallory* involved a law the court enjoined—but when viewed in contrast to this case, it illustrates why *this* law shouldn't be.

First, by focusing on discrimination by the commission in nominating potential judges, the court conflated the question of "who does the Commission nominate" with "who does the Governor ultimately appoint"—and the Eighth

Circuit cautioned in *Carlson* that analysis of the composition and selection methods for nominating commissioners must be careful not to collapse the two functions. *See Carlson*, 675 F.3d at 1140–41. Second, *Mallory* recognized it would be conceivable to show past gross statistical disparity justifying otherwise differential treatment. *See Mallory*, 895 F. Supp. at 1559. It merely found that one inconclusive report the state offered did not in fact show gross statistical disparity. By contrast, here the statistics *do* make that showing.

Further, section 46.2 is also much better tailored than the law in *Mallory* (or *Back* for that matter). The statutes in both cases essentially treated "women and minorities as fungible groups." *Mallory*, 895 F. Supp. at 1561; *see Back*, 933 F. Supp. at 746. This meant there was insufficient tailoring because it could not be necessary "to appoint white women as a remedy for the underrepresentation alleged to have been suffered by racial and ethnic minority groups." *Mallory*, 895 F. Supp. at 1561. But here, the law is narrower—section 46.2 only requires gender balance, not racial balance—*and* it attempted to remedy women being completely excluded from the commission in practice (despite being technically eligible to run) for the first twenty-five years of its existence.

Put simply, even if a myopic and unsupported focus on diversity merely for diversity's sake might not justify a truly gender-discriminatory law, here, section 46.2 serves more, and more holistic, interests. And those interests, or the data points underlying or informing them, are shown in official government publications, "legislative history materials, statistical analyses, . . . anecdotal evidence, and expert declarations." *Meland*, 2021 WL 6118651, at *5. In *Meland*, the record—utilizing similar materials, analyses, and expert declarations—counseled against enjoining a California gender balance law because it supported the "justification . . . of remedying past discrimination." *Id.* That's

present here as well, but it's not the only interest section 46.2 serves. Collectively, those interests justify the statute—even if it it otherwise imposes differential treatment.

And all these interests still justify the gender-balance requirement today. Women are still outnumbered nearly two-to-one by men in the Iowa bar. Critelli Dec., Doc. 20-2, ¶ 6. And the State still needs a State Judicial Nominating Commission that operates as effectively as possible, instills confidence in the public, and encourages diversity—as the challenged gender-balance requirement does. Thus, Plaintiffs' claims are unlikely to succeed, and the Court should not issue any injunction.

## II.   The other *Dataphase* factors don't support upsetting the status quo by enjoining a duly enacted statute that has been in effect for 35 years and continues to serve important state interests.

Under *Planned Parenthood Minn., N.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc), Plaintiffs' failure to show they're likely to succeed is the end of the analysis. And it's unnecessary to "proceed to weigh the other *Dataphase* factors." *Id.* at 732. But considering the other factors doesn't provide Plaintiffs any more help.

First, they've not shown that they will be irreparably harmed. And certainly not in the imminent future necessitating a preliminary injunction now. While Plaintiffs assert a deprivation of constitutional rights, the real harm they assert is a purported inability to appear on the ballot in the election occurring in the congressional districts where they reside. But they haven't taken any action to place their name on the ballot. Gast Dec., Doc. 20-1, ¶ 9. The period for submitting nominating petitions doesn't close for another six months. *Id.* ¶ 7. *See Thrasher v. Grip-Tite Mfg. Co.*, 535 F. Supp. 2d 937, 944–45 (S.D. Iowa 2008) (denying a temporary injunction in February 2008 because

asserted harm that would not occur until May 2008 was not sufficiently imme-
diate). And there's nothing preventing them from seeking to be nominated in
each other's congressional districts even now. *Compare* Iowa Code 46.2(1) (re-
quiring voters to elect "two eligible electors" to the state Commission), *with*
Iowa Code § 46.4(1) (requiring voters to elect "five eligible electors *of the dis-
trict*" to each district commission (emphasis added)).

Additionally, when a litigant "seeks on its motion for preliminary injunc-
tion substantially the same relief it would obtain after a trial on the merits," a
district court does not err in denying an injunction. *Sanborn Mfg.*, 997 F.2d at
490. That's the case here. Plaintiffs' Complaint seeks a permanent injunction
"forbidding the Defendant and his agents from enforcing, or attempting to en-
force" section 46.2, while the Motion for Preliminary Injunction seeks in sub-
stance the same thing, just on a temporary basis.  *Compare* Complaint, Doc. 1,
p. 9, ¶ B, *with* Mtn. for Prelim. Injunction, Doc. 16.  The purported harm to
Plaintiffs at this stage is neither unique nor immediate, so an injunction should
not issue.

Two other factors in the *Dataphase* injunction analysis— "the state of
the balance" between plaintiffs' asserted harm "and the injury that granting
the injunction will inflict on other parties;" and "the public interest"—also
weigh against enjoining section 46.2. *Dataphase Sys.*, 640 F.2d at 113. "[A]ny
time a State is enjoined by a court from effectuating statutes enacted by rep-
resentatives of its people, it suffers a form of irreparable injury." *New Motor
Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in
chambers); *see also Planned Parenthood Minn., N.D. v. Rounds*, 530 F.3d 724,
732–33 (8th Cir. 2008) (en banc). But this harm is even greater here than nor-
mal.

Section 46.2 is obviously not the only part of Iowa Code chapter 46. And another part of that chapter indicates that enjoining section 46.2 could have the effect of stopping *all* judicial selection processes in Iowa—which would be contrary to the public interest by increasing caseloads and increasing delay in resolving existing cases as fewer judges must handle the same number of cases.

Iowa Code section 46.15A provides that if "any provision" of chapter 46 "is preliminarily enjoined, *no judicial nominating commission shall meet* to nominate persons to serve as a judge or justice while the preliminary injunction is in effect or while any appeal of the preliminary injunction or a related permanent injunction is pending unless the injunction is subsequently stayed or otherwise lifted." Iowa Code § 46.15A(2) (emphasis added). Section 46.2 plainly qualifies as "any provision" of chapter 46. And section 46.15A, in turn, could make the consequences quite stark: "no judicial nominating commission shall meet," period. Not at any level, for any opening. Because two of the three nominees for a current Iowa Supreme Court vacancy are sitting judges (June 27, 2022 News Release, https://www.iowajnc.gov/media/cms/News_Release__Announcement_of_Appli_046B3222DFEC1.pdf), that could mean that if the Governor elevates one of the sitting judges to the Iowa Supreme Court, no "backfilling" could occur. Put another way, "[t]he principal role of the court of appeals is to dispose justly of a high volume of cases," Iowa Ct. R. 21.11, but enjoining any provision of chapter 46 could force that state court to attempt to fulfill its principal (and weighty) role while shorthanded. Yet, the court of appeals enters the final decision for a significant number of cases in Iowa. *See* Rosemary Shaw Sackett & Richard H. Doyle, *History of the Iowa Court of Appeals*, 60 Drake L. Rev. 1, 39 (2011) (noting that in 2010, "the court of appeals' holding was the final word in approximately eighty-six percent of all appeals decided by formal opinion"). Thus, it is not in the public interest to enter an

injunction here, and thereby potentially stretch Iowa's state courts (including the court of appeals or any district court with an upcoming vacancy) even thinner than they already are.

Even in *Back*, where the Indiana district court enjoined an Indiana gender balance statute, the Court nevertheless applied Indiana's statutory presumption of severability. *Back*, 933 F. Supp. at 759–60. Here, the statutory instructions are even clearer. Iowa law contains a similar general severability statute, *see* Iowa Code § 4.12, and so does specific chapter 46, *see id.* § 46.15A(1). But more importantly, chapter 46 *also* contains the "full stop" provision, section 46.15A(2), which could significantly harm the public interest by stopping all judicial nominating processes and creating a backlog in Iowa's court system. Therefore, the public interest factor weighs against an injunction here.[2]

## CONCLUSION

Plaintiffs have not satisfied the *Dataphase* factors. They haven't suffered irreparable harm (and aren't about to), their claims are unlikely to succeed, and the other factors (particularly the public interest in considering section 46.15A) weigh in Defendant's favor. Defendant respectfully requests that the Court decline to issue any injunction and award any other relief appropriate under the circumstances.

---

[2] If this Court nevertheless grants Plaintiffs' motion for a preliminary injunction, Rule 65(c) *requires* the court to set a bond. *See* R. Civ. P. 65(c) (authorizing issuance of preliminary injunction "*only if* the movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongly enjoined") (emphasis added)); *see also Rathmann Group v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989). Because the grant of preliminary injunction could prevent the State from filling any judicial vacancy by having a Commission meet, *see* Iowa Code § 46.15A(2), the potential cost to the productivity of the Judicial Branch could be significant.

Respectfully submitted,

THOMAS J. MILLER
Attorney General of Iowa

JEFFREY S. THOMPSON
Solicitor General

/s/ Samuel P. Langholz
SAMUEL P. LANGHOLZ

/s/ David M. Ranscht
DAVID M. RANSCHT
Assistant Attorneys General
Iowa Department of Justice
1305 E. Walnut Street, 2nd Floor
Des Moines, Iowa 50319
(515) 281-5164
(515) 281-4209 (fax)
sam.langholz@ag.iowa.gov
david.ranscht@ag.iowa.gov
jeffrey.thompson@ag.iowa.gov

ATTORNEYS FOR DEFENDANT

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served on counsel for all parties of record by delivery in the following manner on June 28, 2022:

☐ U.S. Mail          ☐ FAX
☐ Hand Delivery      ☐ Overnight Courier
☐ Federal Express    ☐ Other
☒ CM/ECF

Signature: /s/ Samuel P. Langholz

---