IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| RACHEL RAAK LAW and MICAH BROEKEMEIER, | ) ) ) | Case No. 4:22-cv-00176-SMR-SBJ |
| Plaintiffs, | ) ) | ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |
| v. | ) ) | |
| ROBERT GAST, in his official capacity as State Court Administrator for the Iowa Judicial Branch, | ) ) ) ) | |
| Defendant. | ) | |

An Iowa statute requires the Iowa State Bar Association to elect an equal number of men and women to serve on the commission that considers applicants to the Iowa Supreme Court and the Iowa Court of Appeals. Plaintiffs filed suit seeking to enjoin the law on the basis it violates the Fourteenth Amendment of the United States Constitution. Shortly after, Plaintiffs filed a Motion for Preliminary Injunction to prevent enforcement of the law for the upcoming election. For the reasons detailed below, the Motion is DENIED.

## I.      FACTUAL BACKGROUND

### A.  History of the State Judicial Nominating Commission

In 1962, Iowans enacted a constitutional amendment that implemented a new process for selecting individuals charged with considering applicants to the Iowa Court of Appeals and the Iowa Supreme Court. *See* Iowa Const. art. V, §§ 15–16. Specifically, the amendment vested a State Judicial Nominating Commission ("the Commission") with the power to vet applicants who applied to vacancies on Iowa's appellate courts. Iowa Const. art. V, § 16. The Commission

is tasked with interviewing candidates and submitting names of individuals to the Governor of Iowa for further consideration and potential appointment. *Id.*

The first iteration of the Commission consisted of fifteen members. [ECF No. 20-1 at 4 (Iowa Official Register of 1963)]. Seven of the commissioners were selected by the membership of the Iowa State Bar Association ("ISBA") to provide professional opinions on the legal acumen of candidates. *Id.* The ISBA chose individuals to serve on the Commission through an election that used single-member districts. *Id.*

The first ISBA election occurred shortly after the enactment of the new amendments and selected individuals for a term commencing in 1963. [ECF No. 20-1 at 4]. ISBA members did not elect a woman to serve on the Commission in the election.[1] *Id.* Over the next twenty-five years, from 1963 to 1987, ISBA members did not elect any women to serve on the Commission. [ECF Nos. 20-1 at 4–42 (Iowa Official Registers 1963–1986)]. All women who served on the Commission prior to 1987 were appointed by the Governor of Iowa and confirmed by the Iowa Senate.[2] *Id.*

### B. First Amendment to the Commission Structure

In 1987, the Iowa Legislature enacted a law to address the lack of women elected to the Commission. It amended the underlying statute to state, "for the first elective term open on or after July 1, 1987, in the odd-numbered districts the elected member shall be a woman and in the even-numbered districts the elected member shall be a man." Iowa Code § 46.2. (1987).

---

[1] The Court reaches this conclusion based on the first names listed in the documents. At the preliminary injunction hearing, parties agreed this was the best method to identify women on the Commission absent individual analysis. [ECF No. 34 at 14 (Plaintiffs' Agreement); 28 (Defendant's Agreement)].

[2] The first woman was appointed in 1971. [ECF No. 34 at 13–14 (listing "Mrs. William Robinson" as an appointee)]. By the early 1980s, women comprised fifty percent of appointees. *Id.* at 32–35. By the mid-1980s, women were a large majority of appointees. *Id.* at 41–45.

Further, the statute required that "the districts shall alternate between women and men elected members." *Id.* In essence, the statute required ISBA members to elect an equal number of men and women to represent them on the Commission. *Id.* Parties agree the statute was executed as drafted from the date of its enactment until its revision in 2019. *Id.*

### C. Second Amendment to the Commission Structure

The Iowa Legislature recently amended the statutes governing the process used by ISBA members to select representatives to the Commission. 2019 Iowa Acts 302, 312–15. Under the new law, the Commission is comprised of seventeen members, nine of whom are appointed by the Governor and eight of whom are elected by the ISBA membership. Iowa Code §§ 46.1–46.2 (2019). The number of positions elected by ISBA members is evenly split among Iowa's four Congressional districts, which means each Congressional District can select two people. Iowa Code § 46.2(1). The law mandates the elected commissioners be "of different genders," which is understood to require the election of one woman and one man.[3] *Id.* Beyond this, the *de minimis* qualification to serve is an individual must be qualified to vote in Iowa. Iowa Code § 48A(5).

### C. Election Process

The ISBA election that selects the eight commissioners is conducted by the State Court Administrator for the Iowa Judicial Branch. *See* Iowa Code § 46.9(1). The process begins when the State Court Administrator sends ISBA members a release announcing upcoming vacancies

---

[3] Iowa Code §§ 46.1–46.2 conflates gender and sex, assuming they are one and the same and that only two options are available—males who are exclusively men, and females who are exclusively women. Evolving definitions of sex and gender, and the growing number of individuals in the State of Iowa who identify as intersexual, transexual, and non-binary, suggest this understanding may need updated to better reflect a more modern understanding of these definitions. However, those matters are not before the Court today. Thus, for purposes of this Order, the Court adopts the blended binary approach to sex and gender utilized by the challenged provision. The Court speaks of gender and sex interchangeably in its discussions—as is consistent with how the parties have litigated the matter. This choice does not reflect the Court's belief that gender and sex are the same thing, nor that only two options for each exists.

on the Commission.  [ECF Nos. 1-2 at 1 (Sample Announcement); 20-1 at 2 (Gast Depo.)].  The announcement explains the process for an interested individual to run in the election.  [ECF No. 1-2 at 1].  When vacancies occur for terms starting in February, the announcements are generally sent in early December to comply with the statutory notice requirement.  Iowa Code § 46.9A.

A candidate seeking election to the Commission usually submits a nominating petition to appear on the ISBA ballot.  [ECF No. 20-1 at 2].  The individual must submit "the signatures of at least ten eligible [ISBA] electors" to the State Court Administrator as part of the petition.  *Id.*  Only current members of the ISBA may endorse individuals to run for the positions.  *Id.*  The deadline to submit the petition is a month before the term starts, which typically falls in early January.  *Id.*

After the deadline, the State Court Administrator sends out an electronic ballot to current ISBA members.  [ECF No. 1-3 at 2 (Certification of Prior Election)].  The ballot contains names of the candidates who qualified for the election via submission of a nominating petition and a space to add write in candidates.  *Id.*  The eligible electors in the ISBA vote over a brief period. *Id.*  The winner is announced in early February, and they are sworn in afterwards.  *Id.*

### D.  *Upcoming Commission Election[4]*

ISBA members are slated to select three individuals in January 2023 to fill six-year terms commencing in February 2023.  [ECF No. 20-1 at 2].  The statute requires the ISBA members in Iowa's First Congressional District to select a woman to replace outgoing commissioner Dorothy O'Brien.  *Id.*  Electors in Iowa's Third Congressional District must choose another man to

---

[4] Governor Kim Reynolds signed a bill redrawing the boundaries of Iowa's four Congressional Districts on November 4, 2021.  *See* 2021 Iowa Senate File No. 621.  These new boundaries govern which ISBA members may run and vote in which districts.

succeed outgoing commissioner Henry Bevel. *Id.* Finally, eligible lawyers in Iowa's Fourth Congressional District will select a man to replace outgoing commissioner John Gray. *Id.*

The Commission elections will be conducted under the timeframe described earlier in the order. The electronic press release announcing the three vacancies will be sent to members of the ISBA "on or before December 2, 2022." [ECF No. 20-1 at 2]. The deadline "to be placed on the ballot for the 2023 election" by nominating petition is "January 2, 2023." *Id.* After this date, the State Court Administrator will mail the electronic ballots to eligible ISBA voters and voting will occur in January 2023. *Id.* The results and swearing in the new commissioners will most likely occur in late January 2023 or early February 2023. *Id.*

## E. Plaintiffs

Plaintiff Rachel Raak Law lives in Woodbury County, Iowa. [ECF No. 17 (Raak Law First Decl.)]. She served on the District Judicial Nominating Commission, which interviews and recommends candidates for appointment to the Iowa district courts, from 2012 to 2018. [ECF No. 22-1 at 1 (Raak Law Second Decl.)]. She gathered ten signatures "on a nominating petition from the 2021 State Judicial Nominating Commission election." *Id.* at 2. She maintains that the Iowans who signed her previous petition – all of whom reside within the Fourth Congressional District – would sign her nominating petition for the 2023 election.[5] *Id.* She offered to file the names, addresses, and contact information of the individuals under seal. *Id.* Raak Law avers the only reason she cannot run in the Fourth Congressional District election is because the 2023 election is restricted to male candidates. *Id.*

Plaintiff Micah Broekemeier lives in Johnson County, Iowa, in the First Congressional District. [ECF Nos. 18 at 1 (Broekemeier First Decl.); ECF No. 20 at 2]. He previously ran for a

---

[5] The residential locations of the individuals are as follows: Five reside in Correctionville, two reside in Sioux City, two reside in Pierson, and one resides in Holston. [ECF No. 22-1 at 2].

position on the Johnson County Board of Supervisors, where he engaged with lawyers who may support his candidacy for the Commission.  [ECF No. 21-2 at 1 (Broekemeier Second Decl.)].  He currently serves on the nominating committee for the Johnson County Republicans, where he interviews candidates who wish to run for public office.  [ECF No. 18 at 1].  He maintains that numerous eligible individuals "are familiar with my background . . . and support me in my endeavor to be on the . . . Commission."  [ECF No. 21-2 at 2].  Broekemeier asserts he cannot run for election because the Commissioner elected from the First Congressional District in 2023 must be a woman.  *Id.*

## II.     PROCEDURAL BACKGROUND

On May 24, 2022, Plaintiffs Rachel Raak Law and Micah Broekemeier filed this lawsuit against Defendant Robert Gast, the State Court Administrator for the Iowa Judicial Branch.  [ECF No. 1].  They are suing Gast in his official capacity.  *Id.* (citing *Ex parte Young*, 209 U.S. 123, 189 (1980)).   The lawsuit seeks to prevent Gast from enforcing Iowa Code § 46.2 on the ground it violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.  *Id.* at 8.  Specifically, Plaintiffs maintain the requirement prohibits Plaintiff Rachel Raak Law from serving in her northwest Iowa district because the upcoming election is limited to men.  *Id.* at 7.  They assert the law prevents Plaintiff Micah Broekemeier from running for election in his southeast Iowa district because only women may run for the seat in 2023.  *Id.*

On June 16, 2022, Plaintiffs filed a Motion for Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65.  [ECF Nos. 16–18].  They request an order enjoining "Defendant Robert Gast, in his official capacity as State Court Administrator, from taking any further action to enforce the gender quota contained in Iowa Code § 46.2."  [ECF No. 16 at 1].  They maintain the injunction should be granted because they succeed on each of the four preliminary injunction

requirements. *Id.* Defendant filed his resistance to Plaintiffs' Motion on June 28, 2022. [ECF No. 20]. Plaintiffs filed their reply on July 5, 2022. [ECF No. 21].

On July 8, 2022, Defendant filed a Motion to Dismiss. [ECF No. 22]. Defendant maintains the case should be dismissed under Federal Rule of Civil Procedure 12(b)(1) because Plaintiffs do not have Article III standing. [ECF No. 22-1 at 3]. Defendant asserts "the gender-balance requirement for elected state commissioners does not violate the Equal Protection Clause" and the Complaint should be dismissed for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *Id.*

On July 19, 2022, the Court conducted a preliminary injunction hearing. [ECF Nos. 26; 34 (Official Transcript)]. The parties addressed issues ranging from standing to merits at the hearing and answered the Court's questions. *Id.* After the hearing, Defendant timely submitted his response in support of the Motion to Dismiss. [ECF No. 28].

The case is fully briefed and ready for review. For the reasons discussed below, Defendant's Motion to Dismiss, [ECF No. 22], is DENIED. Plaintiffs' Motion for a Preliminary Injunction, [ECF No. 16], is DENIED.

## III. GOVERNING LAW

### A. *Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(1)*

Under Article III, § II of the United States Constitution, courts are limited to disputes that present an actual "case" or "controversy." *Raines v. Byrd,* 521 U.S. 811, 819 (1997). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case – in other words, standing." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (quoting *Raines*, 521 U.S. at 819). A party must demonstrate three elements for standing purposes: "(1) a plaintiff must have suffered an 'injury in fact,' (2) that is 'fairly traceable to the challenged

conduct,' and (3) is 'likely to be redressed by a favorable judicial decision.'" *Hillesheim v. Holiday Stationstores, Inc.*, 900 F.3d 1007, 1010 (8th Cir. 2018) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).   Standing is a jurisdictional prerequisite that must be resolved before reaching the merits.  *Iowa League of Cities v. E.P.A*., 711 F.3d 844, 869 (8th Cir. 2013).

The proper avenue to contest standing is a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(1).  *Disability Support All. v. Heartwood Enters*., *LLC,* 885 F.3d 543, 547 (8th Cir. 2018).  "When standing – and thus a court's jurisdiction – is challenged, '[t]he party invoking federal jurisdiction bears the burden of establishing these elements."  *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "At the pleading stage, general factual allegations . . . may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"  *Wieland v. U.S. Dep't of Health and Hum. Servs.,* 793 F.3d 949, 954 (8th Cir. 2015) (quoting *Lujan*, 504 U.S. at 561).

### B.   Motion to Dismiss Under 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To meet this standard, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A pleading that merely pleads 'labels and conclusions,' or a 'formulaic recitation' of the elements of a cause of action . . .  will not suffice."  *Hamilton v. Palm*, 621 F.3d 816, 817–818 (8th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

### C.   Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008).  A district court must consider four factors before granting this injunction:  "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other [] litigant[s]; (3) the probability that movant will succeed on the merits; and (4) the public interest."  *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981) (en banc).  The last two factors merge when the government is an opposing party.  *Nken v. Holder*, 556 U.S. 418, 435–36 (2009).  "The party seeking injunctive relief bears the burden of proving all the *Dataphase* factors."  *Watkins v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citing *Gelco Corp. v. Coniston Partners*, 811 F.3d 414, 418 (8th Cir. 1987)).

### D.   Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.  This language "does not deny to States the power to treat different classes of persons in different ways."  *Reed v. Reed*, 404 U.S. 71, 75 (1971) (citations omitted).  Legislative classification refers to the way "laws differentiate in some fashion between . . . persons" based on some characteristic.  *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).  "Unless a classification warrants . . . heightened review because it jeopardizes [the] exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest."  *Id.* at 10 (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439–441 (1985)).

The Fourteenth Amendment renders invalid statutes that classify individuals based on a protected characteristic. *Cleburne*, 473 U.S. at 440. These protected characteristics are subject to heightened scrutiny because there is no sensible ground for different treatment. *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion). Sex is one protected characteristic because classifications based on sex "frequently bear[] no relation to the ability" of women or men to perform or contribute to society. *Id.* "Rather than resting on meaningful considerations, statutes distributing benefits and burdens between the sexes in different ways very likely reflect outmoded notions of the relative capabilities of men and women." *Cleburne*, 473 U.S. at 441.

To survive a constitutional challenge brought pursuant to the Fourteenth Amendment, sex classifications "must bear a close and substantial relationship to important governmental objectives." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 273 (1979); *Craig v. Boren*, 429 U.S. 190, 197 (1976); *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017). "Unless a government actor can meet the 'demanding' burden of showing an 'exceedingly persuasive' justification for treating males differently from females, the differential treatment is unconstitutional." *See D.M. by Bao Xiong*, 917 F.3d 994, 1001 (8th Cir. 2019) (quoting *United States v. Virginia.*, 518 U.S. 515, 533 (1996)). This test is understood to be less exacting than strict scrutiny. *H.B. Rowe Co., Inc. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010) (citing *Clark v. Jeter*, 486 U.S. 456, 461 (1988)). "The burden . . . rests entirely on the State." *See Virginia*, 518 U.S. at 533 (1996) (citing *Miss. Univ. of Women v. Hogan*, 458 U.S. 718, 724 (1982)).

## IV.    STANDING ANALYSIS

As discussed below, both Plaintiffs have Article III standing because they can show an injury-in-fact that is fairly traceable to Defendant's enforcement of Iowa Code § 46.2(1). Defendant's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1) is DENIED.

### A.  Injury in Fact

Plaintiffs wish to run for election to represent ISBA members on the Commission.  [ECF No. 1 at 1–2].  They assert that they will suffer an imminent injury if the law is not enjoined.  *Id.* The desire to run for office, when not accompanied with concrete steps such as a plan to submit a completed nominating petition, does not establish an injury-in-fact.  *Lujan*, 504 U.S. at 564. However, submitting a petition would be futile.  The statute prohibits them from seeking election in 2023.  Iowa Code § 46.2 (2019).  This exception excuses the Plaintiffs' failure to apply for the position and bring their injury into existence, a failure that ordinarily precludes a finding of an injury-in-fact.  Accordingly, Plaintiffs have established this element.

### i.  Governing Law

An injury in fact is an "invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not conjectural or hypothetical.'"  *Lujan*, 504 U.S. at 560.  An injury is concrete when it "actually exist[s]."  *Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 690 (8th Cir. 2017).  "Certain harms readily qualify as concrete injuries under Article III," of which "the most obvious are traditional tangible harms, such as physical harms and monetary harms."  *TransUnion*, 141 S. Ct. at 2204.  Intangible harms "with a close relationship to harms have been . . . recognized as providing a basis for lawsuits."  *See Red River Freethinkers v. City of Fargo*, 679 F.3d, 1015, 1024 (8th Cir. 2012).

The injury-in-fact analysis, at least related to concreteness, differs in an equal protection case.  *Ne. Fla. Ch. of Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.,* 508 U.S. 656, 666 (1993).  The injury is a "denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."  *Id.*  Whether the individual may receive the benefit is irrelevant.  *Turner v. Fouche*, 396 U.S. 346, 362 (1970) ("We may assume that the

[plaintiffs] have no right to be appointed to the . . . board of education. But [they] do have a federal constitutional right be *considered* for public service without the burden of invidiously discriminatory disqualifications."). "In the context of a challenge to a set-aside program, the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract." *Gen. Contractors of Am.,* 508 U.S. at 666 (quoting *City of Richmond v. J.A. Croson, Co.,* 488 U.S. 469, 493 (1989)).

An individual may not establish standing solely based on claims of future injury that rely on a generalized intent to engage in conduct. *Lujan,* 504 U.S. at 564 (an individual must have a "description of concrete plans" or "specification of when the some day will be."). Future injury does not constitute an injury in fact if the plaintiff must "meet a precondition or follow a certain procedure to engage in an activity or enjoy a benefit and fail[] to attempt to do so." *Bernbeck v. Gale,* 829 F.3d 643, 649 (8th Cir. 2016) (quoting *Pucket v. Hot Springs Sch. Dist. No. 23-2,* 526 F.3d 1151, 1161 (8th Cir. 2008)); *T.L.J. v. Webster,* 792 F.3d 734, 739–40 (8th Cir. 1986). The court "may find a plaintiff has standing even if he or she has failed to take steps to satisfy a precondition if the attempt would have been futile." *Pucket,* 526 F.2d at 1162 (citing *Sporhase v. Nebraska ex rel. Douglas,* 458 U.S. 941, 944 n.2 (1982)). A reviewing court need not accept allegations of futility and should independently analyze the issue. *Bernbeck,* 829 F.3d at 649.

ii.    Plaintiff Broekemeier's Injury-In-Fact

Plaintiffs Broekemeier would like to run in the ISBA election that will select individuals to serve on the Commission. [ECF No. 18 at 1–2]. Specifically, he asserts, "I would like to serve my community by interviewing candidates for Iowa's appellate courts as a member of the State Judicial Nominating Commission." *Id.* at 1. He is "aware of at least ten people in the First Congressional District that would be willing to sign my nominating petition for the State Judicial

Nominating Commission in December 2022." [ECF No. 21-2 at 2]. The pleadings demonstrate Plaintiff Broekemeier's has a strong interest in running for election.

However, the submissions do not show Broekemeier's desire to stand for election is accompanied by a concrete plan. He did not provide information on when he would acquire the signatures he needs to submit a successful nominating petition. [ECF Nos. 18; 21-2]. He does not submit an estimation of when he would submit a completed petition. *Id.* Broekemeier does not present a rough time frame of when he would like to begin his election run. *Id.* He did not proffer an explanation on whether he completed any steps "to bring his injury into existence." *Bernbeck*, 829 F.3d at 649. It is difficult to interpret the claim as anything beyond a generalized "desire to engage in future conduct at an unspecified and indefinite time." *Id.* A generalized desire, without more, does not establish an injury-in-fact based on future injury. *Lujan*, 504 U.S. at 564.

Although Broekemeier does not have an injury-in-fact under this conception of standing, the Court "*may* find a plaintiff has standing even if he or she has failed to take steps to satisfy a precondition if the attempt would have been futile." *Pucket*, 526 F.3d at 1162 (citation omitted). Broekemeier is precluded from running for the Commission under the statute because it limits the upcoming election in the First Congressional District to women. Based on this exception, the Court nonetheless finds Broekemeier has established standing.

iii.    Plaintiff Raak Law's Injury-in-Fact

Plaintiff Raak Law would like to run for election in the Fourth Congressional District to represent the ISBA on the Commission. [ECF Nos. 17; 22-1]. Unlike Broekemeier, Raak Law pleaded facts that show she has taken concrete steps to run for election. Notably, she spoke with ten individuals who affirmatively expressed interest in serving as one of the necessary signatures

for her nomination.  [ECF No. 22-1 at 2].  Based on this step, the Court concludes Raak Law has shown she has more than a mere interest in running in the election and has a concrete plan for future action.  This is sufficient to show an injury-in-fact.[6]  *Lujan*, 504 U.S. at 564.

## B.   Causation

The Court now examines the second element of Article III standing.  To have standing in federal court, a party's injury-in-fact must be "fairly traceable" to disputed conduct or challenged law.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (holding a plaintiff need not show "but-for" causation for standing).  Lawsuits challenging enforcement of a statute meet this element when "there is a 'causal' connection" between the law and the injury.  *See Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 779 (8th Cir. 2019) (quoting *Lujan*, 504 U.S. at 560).  "[W]hen a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess the authority to enforce the complained-of provision."  *Digit. Recognition Network, Inc. v. Hutchison*, 803 F.3d 952, 957–58 (8th Cir. 2015) (quoting *Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007)).  An injury-in-fact is not fairly traceable if the harm is the result of the "independent action of some third party not before the court."  *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 43 (1976).

The challenged statute prohibits both Broekemeier and Raak Law from running in their respective Congressional Districts to serve as ISBA representatives on the Commission.  Iowa Code § 46.2(1).  Iowa law provides that the election for ISBA members to select the individuals shall be conducted by the State Court Administrator.  *See* Iowa Code § 46.9(1).  The State Court Administrator has created and implemented an extensive process to manage the elections.  [ECF

---

[6] Even if Raak Law had not established traditional standing, the Court can and would find she has established standing in the same manner as Broekemeier.  *See Pucket*, 526 F.3d at 1162.

No. 20-1 at 2–3].  Defendant possesses and exercises authority over the elections, which includes enforcing Iowa Code § 46.2(1).  Plaintiffs have shown causation because the Administrator, who they sue in his official capacity, is the individual tasked with enforcing the statute that prohibits them from seeking election to the Commission.  *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) (quoting *Digit. Recognition Network*, 803 F.3d at 957–58) (noting specific authorization by statute aids the analysis of causation for standing purposes)).  Plaintiffs have demonstrated their harms are traceable to the State Court Administrator's pending enforcement of Iowa Code § 46.2(1).  The second element is met.

## C.  Redressability

The final requirement of Article III standing is that Plaintiffs' injuries be redressable by a favorable court ruling.  *Lujan*, 504 U.S. 560–61.  "To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered."  *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (quoting *Allen v. Wright*, 466 U.S. 737, 753 n.19 (1984)).  The element requires a plaintiff provide more than mere speculation. *Planned Parenthood of Mid-Mo. and E. Kan., Inc. v. Ehlmann*, 137 F.3d 573, 576–77 (8th Cir. 1998).  An injury is redressable if there is a "likelihood that the requested relief will redress the alleged injury."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).

As discussed in the prior section, the challenged statute prohibits Broekemeier and Raak Law from running to serve as ISBA representatives on the Commission.  Iowa Code § 46.2(1). The State Court Administrator enforces this statutory language.  Iowa Code § 46.9(1).  The Court has the authority to enjoin the State Court Administrator, in his official capacity, from enforcing laws that are unconstitutional.  *Calzone*, 866 F.3d at 869–870.  Plaintiffs would no longer face a legal prohibition to their candidacies if the Court enjoined enforcement of Iowa Code § 46.2(1).

In other words, they could submit a completed nominating petition by the statutory deadline and would otherwise be eligible to run.  [ECF Nos. 18-1 at 1; 22-1 at 1].  The Court can provide Plaintiffs relief from their asserted constitutional injury.

*D. Summary*

Plaintiffs have demonstrated that they have Article III standing.  Therefore, Defendant's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) is DENIED.

## V.      FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) ANALYSIS[7]

As discussed in the consideration of standing, Plaintiffs have pled they are prohibited from running to be ISBA elected representatives on the Commission.  [ECF No. 1 at 1].  They aver the reason they cannot run for the Commission is because Iowa Code § 46.2 limits upcoming ISBA elections based on the gender of candidates.  Plaintiff Broekemeier, a man, is not allowed to run in the First Congressional District's election because the election is limited to women this year.  *Id.*  Plaintiff Raak Law, a woman, cannot attempt to be a candidate in the Fourth Congressional District because the particular seat up for election in 2023, under Iowa Code § 46.2, can only be held by a man.  *Id.*  Plaintiffs' allegation that they are prohibited from running for election solely on the basis of their gender is sufficient to survive a Motion to Dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6).  *Mercer v. City of Cedar Rapids, Iowa*, 79 F. Supp. 2d 1055, 1062–63 (N.D. Iowa. 1999); *Meints v. City of Wymore, Neb.*, 4:21-CV-3090, 2022 WL 3088556, at *4 (D. Neb. Aug. 3, 2022).  Therefore, Defendant's Motion to Dismiss is DENIED.

---

[7] The facts come from the complaint, [ECF No. 1].  They are assumed true for the purposes of the Motion to Dismiss.  *Brown v. Medtronic*, Inc., 628 F.3d 451, 459 (8th Cir. 2010) (holding courts must accept as true the plaintiff's factual allegations).

## VI.     PRELIMINARY INJUNCTION ANALYSIS

After resolving the question of standing in favor of Plaintiffs, the Court turns to address the Motion for Preliminary Injunction.  For the reasons discussed in detail below, Plaintiffs have not demonstrated that the four *Dataphase* factors weigh in favor of a preliminary injunction.  Therefore, the Motion for a Preliminary Injunction is DENIED.

### A.  Likelihood of Success on the Merits

#### i.    Governing Standard

The first step in analyzing likelihood of success on the merits is identifying whether the moving party needs to show: (1) a fair chance of succeeding on the merits; (2) or show they are likely to succeed on the merits.  *D.M. by Bao Xiong*, 917 F.3d at 999.  For the reasons below, Plaintiffs must meet the higher standard and show they are likely to succeed on the merits.

"Success on the merits has been referred to as the most important of the four *Dataphase* factors."  *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011).  "There are two standards a district court may apply when assessing a movant's probability of success on the merits."  *See D.M. by Bao Xiong*, 917 F.3d at 999.  "The first, which applies in most instances, directs the district court to ask whether the party requesting a preliminary injunction has a 'fair chance of prevailing.'"  *Id.* (quoting *Planned Parenthood Minn., N.D, S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)).  This standard only requires the moving party to "show a 'fair chance of prevailing.'"  *Jet Midwest Int'l Co., Ltd. v. Jet Midwest Grp.*, LLC, 953 F.3d 1041, 1045 (8th Cir. 2020) (quoting *Rounds*, 530 F.3d at 732).  The movant need not show they "will ultimately win."  *PCTV Gold, Inc. v. SpeedNet, LLC.*, 508 F.3d 1137, 1143 (8th Cir. 2007) (citation omitted).

A second test applies to preliminary injunctions seeking to enjoin the enforcement of a state statute. *See D.M. by Bao Xiong*, 917 F.3d at 999. This test requires a moving party to show that they are "likely to prevail on the merits." *Rounds*, 530 F.3d at 732. This standard "reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference." *Id.* (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995)). A court must evaluate whether "the full play of the democratic process" was involved in the creation and implementation of these laws and then determine the applicability of the elevated standard. *D.M. by Bao Xiong*, 917 F.3d at 1000 (quoting *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016)). Although courts are tasked with examining the process by which laws were enacted, "[s]tate and federal statutes are the output of 'presumptively reasoned democratic processes.'" *Eggers v. Evnen*, 48 F.4th 561, 565 (8th Cir. 2022) (quoting *Rounds*, 530 F.3d at 732, n.6).

The judicial selection process underlying this litigation came into existence after Iowans enacted a constitutional amendment in 1962. Iowa Const. art. V, §§ 15–16. In 1987, the Iowa Legislature enacted a law mandating that elected members of the Commission in odd numbered districts in the upcoming election would be women and members in even districts would be men. After this election, the district in question had to be represented by an individual of the opposite sex. Iowa Code § 46.2 (1987). This was done to ensure there was no more than a simple majority, in this case four out of seven, of men or women elected by the ISBA.

The Iowa Legislature proposed amending the Commission's structure in 2019. Under the 2019 proposal, the ISBA membership in each Congressional District would elect two people. The individuals were required to be opposite genders. This proposal was considered and adopted

by the Iowa Legislature.  2019 Iowa Acts 302, 312–15.  After passage through the legislature, Governor Reynolds signed the law, which was later codified at Iowa Code § 46.2.

This history is sufficient to show the statute was the result of the full democratic process on two separate occasions.  In other words, Plaintiffs must show that they are likely to succeed on the merits to obtain a preliminary injunction.  *Rounds*, 530 F.3d at 732.

### ii.    Type of Classification

Having identified the relevant governing standard, the Court begins its equal protection analysis. The first issue is determining whether Iowa Code § 46.2, which mandates that the individuals representing each Congressional District be "opposite genders," is a sex-based classification.  [ECF Nos. 20 at 9–10; 21 at 3–4].  Defendant maintains the law is subject to intermediate scrutiny only if it mandates "differential treatment" or employs discriminatory means.  [ECF No. 20 at 9] (citing *Virginia*, 518 U.S. at 532–33 and *Miss. Univ.*, 458 U.S. at 724).  Plaintiffs respond the law's contemplation of gender is sufficient to trigger intermediate scrutiny.  [ECF No. 25 at 4] (citing *Virginia*, 518 U.S. at 555).  For the reasons discussed below, the case law supports the application of intermediate scrutiny to Iowa Code § 46.2.

Historically, intermediate scrutiny was used to invalidate only narrow classes of laws that considered sex to the detriment of women.  *Michael M v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464, 469 (1981).  Laws that relied on "overbroad generalizations based on sex which are entirely unrelated to any differences between men and women" were consistently struck down.  *Parham v. Hughes*, 441 U.S. 347, 354 (1979) (Stewart, J., plurality op.); *Kirchberg v. Feenstra,* 450 U.S. 455, 460–461 (1981) (striking down a law that provided men unilateral power to mortgage a home); *see also J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140 (1994).  Statutes that draw a line between "sexes [] [s]olely for the purpose of achieving administrative convenience" were

invalidated.  *See Frontiero*, 411 U.S. at 690 (citation omitted).  Laws that rely on genuine physiological differences between men and women could be upheld.  *Rostker v. Goldberg*, 453 U.S. 57, 81–82 (1981).  Laws that attempted to address social problems experienced by women were subject to less exacting scrutiny.  *Weinberger v. Wiesenfeld*, 420 U.S. 636, 653 (1975).

Over the next few years, the courts expanded the instances in which intermediate scrutiny applied.  The most notable example was when the Supreme Court used intermediate scrutiny to consider the constitutionality of a university's nursing program that prohibited the enrollment of men.  *Miss. Univ.*, 458 U.S. at 732.  This decision provided clarity on two issues relevant to the Court: 1) how to consider programs that use the exclusion of groups to achieve remedial goals; and 2) statutes that classify individuals on the basis of their sex are subject to intermediate scrutiny regardless of whether their intent is invidious discrimination or remedial.  *Id.* at 723–24.

Iowa Code § 46.2 classifies individuals because of their sex and uses this identification for legally cognizable actions.  Specifically, it requires individuals to identify their sex, which is used to determine eligibility for elected office.  Regardless of whether the Court considers the law to be invidiously discriminatory or remedial in nature, this mechanism is sufficient to trigger the application of intermediate scrutiny.  *Miss. Univ.*, 458 U.S. 723–24.  Defendant must show the classification furthers an "'important governmental objective[s] and the discriminatory means employed'" are "'substantially related to the achievement of those objectives'" for the statute to survive.  *D.M. by Bao Xiong*, 917 F.3d at 1002 (quoting *Virginia*, 518 U.S. at 533).

### iii.    Important Interest

The parties vigorously dispute whether an important governmental interest supports the law in question.  [ECF Nos. 16-1 at 11; 20 at 13–14].  The Court finds Defendant has shown that

Iowa Code § 46.2 was supported by a remedial interest at the time of the law's enactment.  As discussed below, the Court further finds that remedial interest remains.  This element is met.

a.   Complete Absence of Elected Women

"In limited circumstances, a gender-based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened." *Miss. Univ.*, 458 U.S. at 728 (citing *Schlesinger v. Ballard*, 419 U.S. 498 (1975)).  Any statute seeking to "evoke a compensatory purpose to justify an otherwise discriminatory classification" may only survive "if members of the gender benefited by the classification actually suffer a disadvantage related to the classification." *Id.* (citing *Califano v. Webster*, 430 U.S. 313, 318 (1977)).  "[T]he mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme." *Wiesenfeld*, 420 U.S. at 648.  Rather, every reviewing court has a duty to "conduct an inquiry into the actual purposes" of the law.  *Virginia*, 518 U.S. at 536 (quoting *Califano v. Goldfarb*, 430 U.S. 199, 212–13 (1977)).  This analysis must solely focus on the provided evidence.  *See Duckworth v. St. Louis Metro. Police Dept.*, 491 F.3d 401, 406 (8th Cir. 2007).

Defendant seeks to justify Iowa Code § 46.2 as a remedial measure.  [ECF No. 20 at 13].  Specifically, he maintains it was implemented after no women were elected to the Commission between its first ISBA election in 1963 and the enactment of the law roughly twenty-five years later.  *Id.*  This assertion is well supported by the Iowa Official Registers, which show no women served in ISBA elected positions prior to the enactment of Iowa Code § 46.2.[8]  [ECF No. 20-1 at 4–44].  The information is sufficient to demonstrate a lack of opportunity for women to serve

---

[8] The parties advised the Court that there was no evidence regarding who ran for the ISBA's elected positions between 1963 and 1988.  The Court assumes, given the State of Iowa's decision to enact Iowa Code § 46.2 at a time when such documents would have been more readily available, that women historically ran for the elected positions and were defeated.

on the Commission through ISBA positions. *See Miss. Univ.*, 458 U.S. at 729. This lack of opportunity is sufficient to implement a gender-based remedial measure, regardless of whether the government participated in the discrimination. *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1580 (11th Cir. 1994); *Coral Const. Co. v. King Cnty.*, 941 F.2d 910, 932 (9th Cir. 1991), *rev'd on other grounds* by *Bd. of Trs. of Glazing Health and Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019) (en banc). In essence, the explanation Defendant provided to the Court is sufficient to meet its burden.

### b.   Cause of Absence

Sex-based remedial measures do not survive a constitutional challenge upon a showing that women lacked opportunity unless there is evidence that sex is a significant cause of the lack of opportunity. *D.M. by Bao Xiong*, 917 F.3d at 1002; *Miss. Univ.*, 458 U.S. at 728 ("[I]t is readily apparent that a State can evoke a compensatory purpose . . . only if members of the gender benefitted by the classification actually suffer a disadvantage related to the classification."). Evidence demonstrating gross statistical disparities in opportunities available to members of a protected class and those not in the protected class may give rise to an inference of discrimination. *Croson,* 488 U.S. at 501 (noting that "'[w]here gross statistical disparities can be shown, they alone in a proper case may constitute *prima facie* proof of a pattern or practice of discrimination' under Title VII"); *Duren v. Missouri*, 439 U.S. 357, 366–67 (1979) (discussing how gross statistical disparities may reveal constitutional violations); *D.M. by Bao Xiong*, 917 F.3d at 1002. This evidence, when proffered in support of a remedial program, must strongly support the suggested remedy for remedial exclusion to survive an Equal Protection challenge. *D.M. by Bao Xiong*, 917 F.3d at 1002–03 (holding that the underrepresentation of girls in league

sports by one or two percent was not sufficient to justify exclusion of boys from a cheerleading program).

As mentioned repeatedly in the Court's analysis, no women were elected by the ISBA to serve on the Commission.  [ECF No. 20-1 at 4–44].  This absence occurred even though women consistently served as appointed members of the Commission and were the majority of political appointees by the mid-1980s.  *Id.* at 38, 41, 44.  This suggests there were many women interested in the Commission and qualified to serve.  *Id.*  This conclusion is supported by the fact the same pattern repeated with the District Judicial Nominating Commission.  *Id.* at 38.  The data bolsters this argument in another way: women served in almost every type of elected position, including the Judicial Qualifications Commission, the Law Examiners Board, and the Advisory Committee on the Administration of Juvenile Court Offices.  *Id.* at 41, 44.  The record shows women were eligible for, interested in, and qualified to be ISBA elected members on the Commission, but did not make it that far.  The proper conclusion to draw is women were excluded based on sex.

### c.   Current Remedial Interest

The last element of this inquiry is that the remedial measure must currently be necessary. In order "for a government actor to classify individuals based on gender for the purpose of remedying a prior lack of opportunities, the individuals must continue to lack opportunities, or the classification is not constitutionally justified."  *D.M. by Bao Xiong*, 917 F.3d at 1002 (citation omitted).  As discussed below, the injunctive record on the current necessity of the law is sparse.

Defendant rests his argument on the current demographic breakdown of Iowa lawyers. [ECF No. 20-2 (Critelli Affidavit)].  The information, compiled by the Executive Director of the Office of Professional Regulation of the Iowa Supreme Court, shows Iowa lawyers were 77.02% men and 22.98% women in 2000.  *Id.* at 2.  It further shows this gap has considerably narrowed

over the past twenty-two years to the point that the breakdown of lawyers in 2022 was 63.25% men and 36.75% women. *Id.* This number shows that women still lack some opportunities to be lawyers and, relevant for the purposes of this case, be among the pool of individuals from whom ISBA representatives are always selected. This information is somewhat probative of the current necessity of Iowa Code § 46.2. *D.M. by Bao Xiong*, 917 F.3d at 1002.

However, this evidence may be insufficient to continue to justify the law. This is because there is no further evidence suggesting women would be underrepresented on the Commission as they were prior to the enactment of Iowa Code § 46.2 (1987). That said, the Court cannot say the evidence shows the opposite, where women would be similarly situated to men in the absence of Iowa Code § 46.2, would be true. Put simply, Plaintiffs have not sufficiently established that the remedial measure is no longer necessary, particularly considering the equitable concerns below. *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021) (quoting Watkins Inc., 346 F.3d at 844) ("the burden of establishing the propriety of an injunction is on the movant.") The record does not provide the Court with information to resolve this hypothetical question.[9]

### d.   Summary

Iowa Code § 46.2 was supported by a remedial interest at the time of its enactment. This remedial interest likely remains, but the evidence on the current necessity of the law is sparse. Thus, the first element of intermediate scrutiny may or may not be satisfied.

### iv.   Tailoring of the Law

The parties sharply contest whether Iowa Code § 46.2 is substantially related to the remedial interest in this case. [ECF No. 16-1 at 12–13]. Plaintiffs maintain there is no legislative record of gender discrimination to support the enactment of the law and the lack of a

---

[9] The Court notes this information may require expert testimony because Iowa Code § 46.2 has been in effect, in one form or another, for thirty-five years.

-24-

sunset provision makes it overly broad. *Id.* Defendant claims the law is appropriately tailored to a remedial need because it only applies to the Commission. [ECF No. 20 at 15]. The Court finds the law is substantially tailored to the remedial need and lacks a gender-neutral alternative. This element supports the law.

a. Fit Between Stated Goal and Implemented Law

"[A] gender-based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened." *Miss. Univ.*, 458 U.S. at 728 (citation omitted); *Webster*, 430 U.S. at 318 ("[t]he challenged statute operated directly to compensate women for past economic discrimination."). When considering the "substantially related" element in a remedial plan, the key inquiry is whether the plan, as applied, furthered the stated goal. *Danskine v. Miami Dade Fire Dep't*, 253 F.3d 1288, 1294 (11th Cir. 2001). A law is not substantially related if it does not make meaningful progress towards the expressly desired outcome. *Califano v. Westcott*, 443 U.S. 76, 88 (1979); *Caban v. Mohammed*, 441 U.S. 380, 391 (1979). This test "does not require that there be no other way to accomplish the objectives." *Cohen v. Brown Univ.,* 101 F.3d 155, 184 (1st Cir. 1996). It merely requires the "chosen tool [be] carefully aimed at the problem, not fired indiscriminately with grave risk of collateral damage." *Franklin v. United States*, 49 F.4th 429, 438 (5th Cir. 2022).

The law addresses the complete absence of women elected by the ISBA, despite plenty of women having the desire and qualifications to serve, by requiring election of equal numbers of men and women. It does not create uneven opportunities, for example, by preferencing one sex over the other in the election. It does not implement inequality among the sexes afterwards. The law did not appear to change any other aspect of the Commission as related to gender except

impose equality for ISBA elections.  As written and implemented, it was appropriately tailored to address the historical absence of women elected by the ISBA.

### b.   Iowa Code § 46.2 and Sex Stereotypes

The Court also notes Iowa Code § 46.2 does not reinforce or create or rely on stereotypes. It does not perpetuate improper stereotypes of women, such asserting they are less interested in or qualified for positions of great importance or responsibility.  *See Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 736 (2003) (discussing how gender stereotypes can become self-fulfilling cycles of discrimination).  Nor does Iowa Code § 46.2 further impermissible stereotypes of men. *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 151–52 (1980) (holding a state compensation death-benefits statute was unconstitutional because it presumed widows, but not widowers, depended on their spouse's earnings); *Morales-Santana*, 137 S. Ct. 1695 ("the assumption that the alien father of a nonmarital child . . . will not accept parental responsibility" is inappropriate). The fact that the law does not impose stereotypes, either intentionally or otherwise, supports a finding that the law was appropriately tailored to the specific need.

### c.   Summary

Iowa Code § 46.2 was enacted to address the absolute absence of women serving in ISBA elected positions on a Commission that reviews judicial candidates for Iowa's highest courts.  It mandated equality to address underrepresentation among populations that are equally qualified to engage in this work.  The Court cannot say the law is not substantially related to this interest.

## B.   Threat of Irreparable Harm

The next factor requires a moving party to show they will suffer an irreparable harm if the preliminary injunction is not granted.  *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 318–19 (8th Cir. 2009) (citing *Dataphase*, 640 F.2d at 113).  "A party must show that the

harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Util. Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996) (citing *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986)).  Likewise, there must be no alternative besides granting the preliminary injunction that would redress the harm.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 846–47 (8th Cir. 2003) (affirming the district court's denial of a preliminary injunction because adequate relief was available to Plaintiffs in the form of money damages).  A violation of a constitutional right is "an irreparable injur[y] for the purposes of a preliminary injunction motion."  *Pavek v. Simon*, 467 F. Supp. 3d 718, 754 (D. Minn. 2020) (citing *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")).

Plaintiffs Raak Law and Broekemeier wish to participate in an upcoming ISBA election. They are prohibited from doing so by Iowa Code § 46.2, which they allege violates their rights under the Equal Protection Clause of the Fourteenth Amendment.  Without a court order allowing them to submit nominating petitions, they are ineligible to run for the election in two months' time.  As discussed above, the currently developed record supports a finding Iowa Code § 46.2 does not violate the Equal Protection Clause of the United States Constitution.  Plaintiffs have not shown they will suffer an irreparable injury because the law that makes them ineligible to run in the upcoming election is permissible.  This element favors the Defendant.

### C.  Balance of the Equities

The final factor is a balancing of the equities.  "A court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene . . . until the merits are determined."  *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998) (quoting *Calvin Klein*, 815 F.2d at 503).  "In

balancing the equities, we weigh 'the threat of irreparable harm' shown by the movant against 'the injury that granting the injunction will inflict on other parties.'" *MPAY Inc. v. Erie Custom Comput. Applications, Inc*., 970 F.3d 1010, 1020 (8th Cir. 2020) (quoting *Dataphase Sys.*, 640 F.2d at 113). "It is in the public interest to uphold the will of the people, as expressed by acts of the state legislature, when such acts appear harmonious with the Constitution." *Pavek v. Donald J. Trump for President, Inc.*, 967 F.3d 905, 909 (8th Cir. 2020) (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives, it suffers a form of irreparable injury.").

The balance of the equities weighs heavily against the entry of a preliminary injunction. Plaintiffs would be excluded from participating in upcoming elections conducted by the ISBA membership. This harm, while significant, is caused by the enforcement of law whose constitutionality cannot be determined on this record. Enjoining this law would create an irreparable injury to the State of Iowa because it could no longer be able to enforce this duly enacted law. *Pavek*, 967 F.3d at 909.

Further, granting an injunction may halt future nomination processes relevant to the Iowa Supreme Court and Iowa Court of Appeals until the resolution of the lawsuit. The Iowa Code provides that "if any provision of this chapter is preliminarily enjoined, no judicial nominating commission shall meet to nominate persons to serve as a judge or justice while the preliminary injunction is in effect." Iowa Code § 46.15A. Notably, this language also applies to "any appeal of a preliminary injunction." *Id.* Put simply, the State of Iowa would face an enormous harm because it would not be able to fill any vacancies that occur on the Iowa Supreme Court or Iowa

Court of Appeals.[10]   Accordingly, the Court concludes a balance of the equities shows Defendant would suffer significant harm if it granted the requested preliminary injunction.   This element weighs against granting the injunction.

### D.  Summary

The dispute before the Court is challenging.   The evidence shows Iowa Code § 46.2 was enacted to remedy the complete absence of women serving as ISBA elected representatives on the Judicial Nominating Commission.   However, the record is sparse on the continuing need for the law.    Although the likelihood of success is a close question in the absence of this information, the remaining factors weigh against granting an injunction.   The State of Iowa has a strong interest in enforcing a duly enacted law, and – by operation of its own unwise design – an injunction related to Plaintiffs Raak Law and Broekemeier would prevent Iowa from filling current or upcoming vacancies on the Iowa Supreme Court and Iowa Court of Appeals for the foreseeable future.   Balancing these interests, the Court cannot say Plaintiffs' initial showing of success on the merits has entitled them to the extraordinary relief of a preliminary injunction. *Progressive Techs., Inc. v. Chaffin Holdings, Inc*., 33 F.4th 481, 485 (8th Cir. 2022) (quoting *Winter*, 555 U.S. at 24) ("A preliminary injunction is an extraordinary remedy never awarded as of right."); *H & R Block Tax Servs. LLC v. Acevedo-Lopez*, 742 F.3d 1074, 1077 (8th Cir. 2014) (quoting *Winter*, 555 U.S. at 22) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such

---

[10] The Court notes that the degree of harm the State of Iowa would suffer in the event this policy is enjoined is, in no small part, a self-inflicted wound.  It opted to insert a provision into its law that triggers an unnecessary cascade of harms if an injunction is granted by any court in relation to an election.  This legislative choice was considered by the Court in weighing the harm an injunction may pose.

relief."); *Watkins Inc.*, 346 F.3d at 844 ("the burden of establishing the propriety of an injunction is on the movant.").

VII.    CONCLUSION

For the reasons discussed above, Defendant's Motion to Dismiss, [ECF No. 22], is DENIED.  Plaintiffs' Motion for a Preliminary Injunction, [ECF No. 16], is DENIED.


IT IS SO ORDERED.

Dated this 20th day of November, 2022.

STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT