**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| CHARLES HURLEY, an individual, | ) | |
| | ) | Case No. 4:22-cv-00176-SMR-SBJ |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM IN SUPPORT OF** |
| ROBERT GAST, in his official capacity as | ) | **PLAINTIFF'S MOTION FOR** |
| State Court Administrator for the Iowa | ) | **SUMMARY JUDGMENT** |
| Judicial Branch, | ) | |
| | ) | |
|     Defendant. | ) | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

LEGAL STANDARD.......................................................................................................... 2

ARGUMENT ...................................................................................................................... 2

   I.     Plaintiff Charles Hurley Has Article III Standing........................................... 2

   II.    The Gender Quota Is *Per Se* Unconstitutional................................................ 3

   III.   The Gender Quota Fails Intermediate Scrutiny .............................................. 4

      A.   The Gender Quota Does Not Further an Important Governmental Objective.............. 4

          i.    The Gender Quota Does Not Remedy Past or Present Sex-Based Discrimination Against Women ............................................................ 5

          ii.   General Evidence of Disparities Does Not Prove Discrimination......................... 8

          iii.  Gender Parity Is Not an Important Government Objective ................................. 10

          iv.  Defendant's Remaining Purported Interests Cannot Be Subjected to Meaningful Review....................................................... 11

      B.   The Gender Quota Is Not Substantially Related to Any Important Government Objective ................................................................. 12

          i.    Rigid Quotas Do Not Satisfy Intermediate Scrutiny............................................. 12

          ii.   The Gender Quota's Stereotypes Are Offensive and Illegitimate ....................... 14

          iii.  The Gender Quota Is Not Time-Limited .......................................................... 15

CONCLUSION.................................................................................................................. 16

CERTIFICATE OF SERVICE ........................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adickes v. S. H. Kress & Co.*,
  398 U.S. 144 (1970)...................................................................................2

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...................................................................................2

*Associated General Contractors of California, Inc. v. City and County of San
  Francisco*, 813 F.2d 922 (9th Cir. 1987) .................................................7

*Back v. Carter*,
  933 F. Supp. 738 (N.D. Ind. 1996) ...........................................................7

*Butler v. MFA Life Ins. Co.*,
  591 F.2d 448 (8th Cir. 1979) .....................................................................2

*Califano v. Goldfarb*,
  430 U.S. 199 (1977) ...................................................................................8

*City of Richmond v. J.A. Croson Co.*,
  488 U.S. 469 (1989)..................................................................3, 7, 9, 10, 15

*Concrete Works of Colorado, Inc. v. City & Cnty. of Denver*,
  321 F.3d 950 (10th Cir. 2003) ...................................................................4

*Craig v. Boren*,
  429 U.S. 190 (1976)..................................................................................15

*D.M. by Bao Xiong v. Minn. State High Sch. League*,
  917 F.3d 994 (8th Cir. 2019) .....................................................................7

*Dick v. Dickinson State Univ.*,
  826 F.3d 1054 (8th Cir. 2016) ...................................................................2

*Fisher v. University of Texas at Austin (Fisher II)*,
  579 U.S. 365 (2016)..............................................................................3, 4

*Grutter v. Bollinger*,
  539 U.S. 306 (2003)..........................................................................3, 4, 16

*J. Edinger and Son, Inc. v. City of Louisville*,
  802 F.2d 213 (6th Cir. 1986) .....................................................................7

*J.E.B. v. Alabama ex rel. T.B.*,
   511 U.S. 127 (1994)..............................................................................................4

*Johnson v. Transportation Agency, Santa Clara Cnty.*,
   480 U.S. 616 (1987)............................................................................................15

*Law v. Gast*, No. 22-CV-00176,
   2022 WL 17337601 (S.D. Iowa Nov. 20, 2022)..................................................3, 4

*Main Line Paving Co. v. Bd. of Educ., Sch. Dist. of Philadelphia*,
   725 F. Supp. 1349 (E.D. Pa. 1989)....................................................................9

*Mallory v. Harkness*,
   895 F. Supp. 1556 (S.D. Fla. 1995) ...................................................................9

*Mayor of Philadelphia v. Educational Equality League*,
   415 U.S. 605 (1974)............................................................................................14

*Miller v. Johnson*, 515 U.S. 900 (1995)....................................................................10

*Mississippi Univ. for Women v. Hogan*,
   458 U.S. 718 (1982)....................................................................................4, 6, 12

*Moore v. Martin*, 854 F.3d 1021 (8th Cir. 2017)........................................................2

*Personnel Administrator of Mass. v. Feeney*,
   442 U.S. 256 (1979)............................................................................................16

*Regents of Univ. of California v. Bakke*,
   438 U.S. 265 (1978)....................................................................................3, 4, 10

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) .....................................................12, 15

*Scottsdale Ins. Co. v. Avery Tech. Res., Inc.*,
   No. 4:21-cv-00238, 2023 WL 2441628 (S.D. Iowa Jan. 17, 2023).........................2

*Shelley v. Kraemer*, 334 U.S. 1 (1948) ....................................................................14

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College
   (SFFA)*, 143 S. Ct. 2141 (2023)..................................................10, 11, 14, 15, 16

*United States v. Virginia*,
   518 U.S. 515 (1996)....................................................................................4, 8, 14

*Vacca v. Viacom Broad. of Missouri, Inc.*,
   875 F.2d 1337 (8th Cir. 1989) ...........................................................................2

*Weinberger v. Wiesenfeld*,
   420 U.S. 636 (1975)....................................................................................8, 10, 15

*Wengler v. Druggists Mutual Ins. Co.*,
    446 U.S. 142 (1980)................................................................................................4

*Westchem Agric. Chems., Inc. v. Ford Motor Co.*,
    990 F.2d 426 (8th Cir. 1993) ...............................................................................2

*Wygant v. Jackson Bd. of Ed.*,
    476 U.S. 267 (1986)............................................................................................10

**Statutes**

1987 Iowa Acts 364 ...............................................................................................6, 10

Iowa Code § 46.2 ..............................................................................1–6, 8, 11, 14–16

Iowa Code § 46.2(1) ...................................................................................1, 3, 4, 8, 10

## INTRODUCTION

Ironically, the very thing that prevents women from joining Iowa's State Judicial Nominating Commission (Commission) is the law that's supposedly designed to remedy discrimination against women. Iowa Code § 46.2 (Gender Quota) mandates a strict sex-based quota for elected commissioners: each congressional district gets one man and one woman. No more, no less. The only gender equality Section 46.2 promotes is that it discriminates against women *and* men.

One of those men is Plaintiff Charles Hurley, a devoted father and grandfather who has spent the past 40 years serving his community as an attorney, public representative, and church member. During his time as a state representative, Mr. Hurley served as Vice-Chair and Chair of the House Judiciary Committee, where he routinely met with the Chief Justice of the Iowa State Supreme Court on issues confronting the state judiciary. Plaintiff's Statement of Material Facts (SMF) ¶¶ 28–30. Mr. Hurley wants to use his extensive experience to serve his community on the Commission. *Id.* at ¶ 34. While he would like to be considered for the opening in his congressional district in 2025, Mr. Hurley's candidacy faces the same fate as that of dismissed Plaintiffs Rachel Raak Law and Micah Broekemeier for one simple reason—his gender. *Id.* at ¶¶ 39–40.

For nearly the entirety of Mr. Hurley's career, Iowa law has demanded a fixed "gender balance" that dictates how many men or women can serve on the State Judicial Nominating Commission. *See* Iowa Code § 46.2(1). Men are only considered for vacancies previously held by other men, and women are only considered for vacancies previously held by other women. SMF ¶ 37. When administering the 2023 elections this past January, Defendant denied former Plaintiffs Rachel Raak Law and Micah Broekemeier the opportunity to appear on the ballots in their respective districts because the vacancies sought by the former Plaintiffs were reserved for individuals of a different gender. SMF ¶¶ 51, 63. Absent this Court's intervention, Mr. Hurley and

countless other Iowans will face the same discrimination in 2025 and in future elections to come. Because the Gender Quota is plainly unconstitutional, and there are no material facts in dispute, this Court should grant Plaintiff's Motion for Summary Judgment.

## LEGAL STANDARD

The court shall grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Moore v. Martin*, 854 F.3d 1021, 1025 (8th Cir. 2017) (citing Fed. R. Civ. P. 56(a)). There is a genuine dispute "when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (citing *Westchem Agric. Chems., Inc. v. Ford Motor Co.*, 990 F.2d 426, 429 (8th Cir. 1993)). A fact is "material" if it "might affect the outcome of the suit." *Scottsdale Ins. Co. v. Avery Tech. Res., Inc.*, No. 4:21-cv-00238, 2023 WL 2441628, at *2 (S.D. Iowa Jan. 17, 2023) (citing *Dick*, 826 F.3d at 1061).

While evidence is viewed in the light "most favorable to the nonmoving party," and the nonmoving party enjoys "the benefit of all reasonable inferences to be drawn from the facts," the existence of "some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment if there is no genuine issue of material fact." *Vacca v. Viacom Broad. of Missouri, Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986)). *See also Butler v. MFA Life Ins. Co.*, 591 F.2d 448, 451 (8th Cir. 1979) (". . . this Circuit recognizes the remedy's salutary purpose of avoiding . . . time consuming trials").

## ARGUMENT

### I. Plaintiff Charles Hurley Has Article III Standing

Plaintiff Charles Hurley has standing to challenge Iowa Code Section 46.2—as conceded by Defendant and confirmed by this Court in its recent order. *See* Def.'s Mot. to Dismiss in Part,

ECF No. 72; Order Granting Def.'s Mot. to Dismiss, ECF No. 84 (". . . rationale in favor of the mootness exception does not apply if claims will eventually face review **like they will in this case due to the presence of Plaintiff Hurley**") (emphasis added). Defendant previously sought to dismiss this case on grounds that former Plaintiffs Rachel Raak Law and Micah Broekemeier filed too early. *See* Def.'s Mot. to Dismiss, ECF No. 21 at 9 (claiming that they lacked standing because "they haven't been excluded from the ballot"). After Ms. Raak Law and Mr. Broekemeier sought to be placed on the ballot in their respective districts and were denied on the basis of their gender, Defendant asserted that they should be dismissed because they had "fail[ed] to file a lawsuit sooner." *See* Def.'s Mot. to Dismiss in Part, ECF No. 72 at 11. Defendant makes no such Morton's Fork arguments regarding Mr. Hurley's challenge, nor can he, given that Mr. Hurley seeks to run in the 2025 election but is barred by the Gender Quota. *Law v. Gast*, No. 22-CV-00176, 2022 WL 17337601, at *7–*8 (explaining why challengers to Gender Quota have standing in this case).

## II.   The Gender Quota Is *Per Se* Unconstitutional

Section 46.2 requires that resident members of the Iowa Bar of each congressional district elect two commissioners "of different genders to the state judicial nominating commission." Iowa Code § 46.2(1). This is a quota. *See Grutter v. Bollinger*, 539 U.S. 306, 335 (2003) ("[A] 'quota' is a program in which a certain fixed number or proportion of opportunities are 'reserved exclusively for certain . . . groups.'") (citing *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 496 (1989)). Quotas are *per se* unconstitutional. *See, e.g.*, *id.*; *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 319 (1978); *Fisher v. University of Texas at Austin (Fisher II)*, 579 U.S. 365, 376 (2016).

Defendant testified that he understood a quota to be "a set number . . . of peoples representing, in this case, possibly gender and/or race." Gast Dep. 35:2–7, App. 0085. Section 46.2(1) "set[s] aside a number" of men and women that must be elected in each congressional

district. On its face, Section 46.2(1) requires that 50% of the commissioners for each congressional district must be male, and 50% must be female. Iowa Code § 46.2(1). That is a quota, and under *Bakke, Grutter, Fisher II*, and others, it is *per se* unconstitutional.

### III.  The Gender Quota Fails Intermediate Scrutiny

This Court determined that Section 46.2 is a sex-based classification that triggers intermediate scrutiny. *Law*, 2022 WL 17337601 at *10. Under this intermediate scrutiny, Defendant must show that the Gender Quota's sex-based classifications serve "important governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives." *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) (citing *Wengler v. Druggists Mutual Ins. Co.*, 446 U.S. 142, 150 (1980)). This is a "demanding" burden that "rests entirely on the State," and the government gets no deference. *United States v. Virginia*, 518 U.S. 515, 533, 555 (1996) (when applying intermediate scrutiny, courts should not engage in "deference to [the] legislative will.").

### A.  The Gender Quota Does Not Further an Important Governmental Objective

Sex-based classifications are presumptively invalid. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 152 (1994) (Kennedy, J., concurring). Overcoming that presumption requires an "exceedingly persuasive justification" for the sex-based distinctions. *Miss. Univ. for Women*, 458 U.S. at 724. Here, Defendant bears the burden of showing that Section 46.2 is based on "reasoned analysis" rather than the "mechanical application of traditional, often inaccurate, assumptions." *Concrete Works of Colorado, Inc. v. City & Cnty. of Denver*, 321 F.3d 950, 959 (10th Cir. 2003) (citing *Hogan*, 458 U.S. at 726). He cannot. There is no evidence to support any of Defendant's proffered justifications of "remedying past unequal election of women to the judicial nominating commission, improving the quality and integrity of Commission deliberations, fostering diversity in the merit selection process, and maintaining public confidence in the selection and legitimacy

4

of Iowa's courts." Pltfs.' Reply in Support of Mot. for Prelim. Inj., ECF No. 21 at 9, 13–14. Nor is there evidence to support the continued enforcement of the Gender Quota. Defendant has not met the demanding burden to prove that the Gender Quota serves an important government interest.

### i. The Gender Quota Does Not Remedy Past or Present Sex-Based Discrimination Against Women

There is no evidence that the Gender Quota is necessary to remedy past sex-based discrimination against women seeking to serve on state judicial nominating commissions, or that the alleged remedial need continues to exist today.[1] Defendant admits he is aware of no discriminatory laws, policies, or actions by the State that discriminated against female candidates between the commission's inception and Section 46.2's implementation. Gast Dep. 28:18–29:24, App. 0078–79. None. Defendant's only argument that discrimination against women persisted is conclusory and unscientific: because Defendant's records purport to show no female-sounding names that were elected members of the state nominating commission until Section 46.2 was implemented, Defendant assumes sex-based discrimination was the cause. Gast Dep: 25:4–12, App. 0075.

This argument has no foundation: Defendant arrived at his conclusion that discrimination was prevalent by examining a list of the first and last names of elected commissioners from 1963 to 1987 and attempting to identify female-sounding names, which he then checked against the memory of an Iowa attorney. Gast Dep. 19:14–20:8, App. 0069–70; Gast Dep. Ex. 1 at ¶10, App.

---

[1] The Gender Quota also *denies women the opportunity* to run for election in 50% of the Commission positions by reserving those seats exclusively for men, yet Defendant provides no evidence to warrant men's preferential treatment. *See* Pltfs.' Opp. to Def.'s Mot. to Dismiss in Part, ECF No. 75-1; Def.'s Ans. to Pltfs.' First Set of Interrogatories No. 11, App. 0016–17. Instead, for half of the elected positions the Gender Quota discriminates against the very women it claims to help. How can a law that purports to remedy discrimination against women be tailored to that purpose when it discriminates against women? *See infra* Section B.

0086–88; Decl. of David L. Brown, ECF No. 24 at ¶¶ 4–5. The list of first and last names contained no gender information and neither Defendant nor the attorney took any steps to confirm the gender of the elected commissioners on the list. Gast Dep. 19:20–20:8, App. 0069–70. Defendant produced limited evidence of how many women ran unsuccessfully in each election, and how close the elections were. Defendant produced no evidence of the reasons women chose to run for election (or not to run), or anything else that would provide context beyond the bare contention that sex-based discrimination against women must be remedied because no person with a female-sounding name served as an elected commissioner between 1963 and 1987. Gast Dep: 21:25–22:8, App. 0071–72.

This fact, without more, does not prove discrimination. It barely *suggests* discrimination. It is a far, far cry from the *exceedingly persuasive* evidence the state is required to proffer to engage in sex discrimination. Requiring the government to demonstrate that discrimination actually exists is not some irrelevant formalism. It not only ensures that "members of the gender benefited by the classification *actually suffer* a disadvantage related to the classification," but also that the law does not "reflect or reinforce archaic and stereotyped notions" of women's capabilities, like the perception that women can't win election to the Commission without government help. *Miss. Univ. for Women*, 458 U.S. at 725, 728 (emphasis added).

Section 46.2 itself says nothing about sex-based discrimination; it was amended in 1987 as part of an act "relating to gender balance in the appointment and election of judicial nominating commissioners and balance in the appointment of members of state boards, commissions, committees, and councils." 1987 Iowa Acts 364–65. Disparities may arise as a result of any number of non-discriminatory factors because each woman is a unique individual who makes individual choices. For example, the lack of women elected to the Commission prior to 1987 could have

resulted from the number of female resident members of the Iowa State Bar, *see Back v. Carter*, 933 F. Supp. 738, 756 (N.D. Ind. 1996) (factors related to law school may create disparities in the field of law), or the number of women who seek out volunteer positions on state commissions. *See J. Edinger and Son, Inc. v. City of Louisville*, 802 F.2d 213, 215 (6th Cir. 1986) (comparison must be between relevant groups, "not merely rely upon general population statistics."); *Associated General Contractors of California, Inc. v. City and County of San Francisco*, 813 F.2d 922, 933 (9th Cir. 1987) (city must look at relevant labor pool, not general population). Here, Defendant's "generalized assertion that there has been past discrimination" against women in the Commission electoral process "provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Croson,* 488 U.S. at 498. Defendant's complete lack of evidence is plainly insufficient to justify any remedial interest in the Gender Quota.

While there was next to nothing as far as evidence to justify the Gender Quota in 1987 when it was enacted, there is even less to justify the Gender Quota today. There is no evidence that the Gender Quota is necessary to remedy current sex-based discrimination against women seeking to serve on the Commission. None. That is enough to decide this case. The Eighth Circuit is clear that "for a government actor to classify individuals based on gender for the purpose of remedying a prior lack of opportunities, the individuals must continue to lack opportunities or the classification is not constitutionally justified." *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1002 (8th Cir. 2019) (citing *Miss. Univ. for Women*, 458 U.S. at 729). Defendant fails to support his assertion that a remedial interest remains for the Gender Quota—nor has he addressed this Court's finding that the evidence on the current necessity of the Gender Quota was "sparse." Order on Pltfs.' Mot. for Prelim. Inj., ECF No. 36 at 24. There is no proof women continue to lack opportunities to run for election to the Commission, if indeed they ever did.

Significantly, Defendant could identify no female lawyers who claimed to have been discriminated against in running for or serving on the Commission and has never been approached by *anyone* with claims of discrimination. Gast Dep. 28:12–29:24, App. 0078–79. The number of female resident lawyers in Iowa increased significantly in the last two decades, and presumably even more significantly since 1987. Decl. of Nicholas (Tré) Critelli, III, ECF No. 20-2.

Defendant's expert Dr. Rachel Caufield is no help. Dr. Caufield testified that the state has never restricted women from running for or serving on the Commission—except, of course, the text of Section 46.2(1), which does prevent women from running. Caufield Dep. 104:8–22, App. 0131. She did not know whether Iowa could achieve comparable Commission composition without the Gender Quota, *id*. at 65:3–7, App. 0116, and could only guess at the reasons for increased female participation on judicial nominating commissions over the last forty years. *Id*. at 89:7–90:16, 93:11-94:7, App. 0125–30.

### ii.     General Evidence of Disparities Does Not Prove Discrimination

The government cannot satisfy the important objective requirement of intermediate scrutiny merely by offering "general evidence of gender discrimination." *Virginia*, 518 U.S. at 533. The justification must be "genuine, not hypothesized or invented *post hoc* in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.* at 533 (citing *Weinberger v. Wiesenfeld*, 420 U.S. 636, 643, 648 (1975); *Califano v. Goldfarb*, 430 U.S. 199, 223–224 (1977) (Stevens, J., concurring in judgment)). Yet, underpinning Defendant's justifications for the Gender Quota are precisely such generalizations, beginning with the broad, imprecise data Defendant contends justifies Section 46.2's sex-based prohibitions.

Defendant focuses on statistical disparities within Iowa's population at large, as well as within the legal profession itself, but does not provide any evidence that these disparities are a result of discrimination against women. For example, Defendant demonstrates no link between "the current gender [im]balance in the bar" and government discrimination against women running for the Commission. *See* Hrg. Transcript, App. 0138. Defendant equally fails to connect the dots between its observation that "the population consistently has been around 50-50 male and female" and government discrimination against women running for the Commission. *Id*. Disparities alone do not demonstrate discrimination. *See Main Line Paving Co. v. Bd. of Educ., Sch. Dist. of Philadelphia*, 725 F. Supp. 1349, 1363 (E.D. Pa. 1989) (no substantial relation because the government presented no statistical evidence to show how women were disadvantaged and no evidence that any statistical disparity was caused by gender discrimination); *Mallory v. Harkness*, 895 F. Supp. 1556, 1559 (S.D. Fla. 1995) (invalidating gender quota where the government "did not positively identify any discriminatory policy or practices" and pointed solely to disparities).

Even if Defendant's back-of-the-napkin statistical analyses are to be taken at face value, the proffered statistics must be reviewed in light of the history of the varying qualifications needed to appear on the ballot for openings to the Commission—comparisons to the general population provide limited probative value when there are specific requirements that must be met for particular positions. *See Croson*, 488 U.S. at 501. Due to formal and informal requirements, Commission positions have not been accessible to the general public. For example, Defendant notes that there were past "barriers to participation," such as obtaining the signatures of 50 lawyers for an individual to appear on the ballot, *see* Hrg. Transcript, App. 0136. Defendant's expert testified that while Iowa law does not require commission members elected by the Iowa Bar to be lawyers, those members have always been attorneys. *See* Caufield Decl. at ¶ 5, ECF No. 20-3.

Especially given this context, Defendant's broad generalizations do not support the Gender Quota's sex-based discrimination among qualified candidates for the Commission.

### iii.    Gender Parity Is Not an Important Government Objective

Rather than remedy concrete sex-based discrimination, the Gender Quota's stated objective is to achieve "gender balance" on the Commission. 1987 Iowa Acts 364. This is "discrimination for its own sake" and "facially invalid." *Bakke*, 438 U.S. at 307; *see also Students for Fair Admissions, Inc. v. President and Fellows of Harvard College (SFFA)*, 143 S. Ct. 2141, 2172 (2023) (in the context of racial classifications, outright balancing is "'patently unconstitutional.'") (citing *Fisher v. University of Texas (Fisher I)*, 570 U.S. 297, 311 (2013)). This is, as the Court has "repeatedly explained, because '[a]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not simply as components of a racial, religious, sexual or national class.'" *SFFA*, 143 S. Ct. at 2172 (citing *Miller v. Johnson*, 515 U.S. 900, 911 (1995)).

The Gender Quota is not transformed from a patently unconstitutional objective into a legitimate one because it may seek to compensate women for generalized societal discrimination. Such an objective presents "an amorphous concept of injury that may be ageless in its reach into the past," *Bakke*, 438 U.S. at 307, and has been repeatedly rejected as a basis for discrimination against individuals due to immutable characteristics in the racial context and never explicitly approved of in the context of sex. *See id.* at 310; *Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267, 274 (1986); *Croson*, 488 U.S. at 496–97; *SFFA*, 143 S. Ct. at 2173.

Defendant's "mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme." *Weinberger*, 420 U.S. at 648. With no reliable evidence of sex-based discrimination by the government, and only amorphous, immeasurable goals, the actual purpose underlying Section

46.2(1) is revealed to be impermissible gender balancing. This is not the "exceedingly persuasive" justification required to support sex-based classifications.

### iv.     Defendant's Remaining Purported Interests Cannot Be Subjected to Meaningful Review

Defendant's other justifications for the Gender Quota— improving the quality and integrity of Commission deliberations, fostering diversity in the merit selection process, and maintaining public confidence in the selection and legitimacy of Iowa's courts—are "not sufficiently coherent" to permit judicial review. *SFFA*, 143 S. Ct. at 2166. In *SFFA*, the Court questioned how such amorphous goals could be measured, and if they could be, how a court would know when they have been reached and the "perilous remedy" of a discriminatory classification can end. *Id*. The *SFFA* Court concluded it could not, and the same is true of the Gender Quota.

There is no evidence that the Gender Quota accomplishes its undefined and immeasurable objectives. And Defendant offers no way to know when and if its amorphous goals are achieved. Defendant testified that Section 46.2 improves the integrity of commission deliberations and the courts' institutional legitimacy by generally being "representative" of the community, but his department has never surveyed Iowa Bar members or the general public to determine if it actually has that effect. Gast Dep. 25:23–27:11, App. 0075–77. Dr. Caufield testified that there is no conclusive research on whether Iowa's system of selecting judges results in a more diverse judiciary, despite a "surprising amount of research" on the question. Caufield Dep. 109:17–110:9, App. 0133–34. Even the premise that the Gender Quota *could* accomplish these objectives is questionable; the "sophisticated survey analysis" that Dr. Caufield asserts shows that "women's equal presence grants legitimacy to political decisions and democratic procedures" is in reality a nationwide internet survey where the gender and identity of respondents is self-reported and unverified. Caufield Dep. 65:25–66:23, 68:5–72:25, App. 0116–23. Instead, Dr. Caufield relies on

stereotypes about women like "women are taught to defer more often than speak," and "women speak less often" in male settings, *id.* at 83:4–13, App. 0124, or that the Gender Quota is necessary because women "are more likely to find [the competitive nature of an election] daunting in situations where other candidates are male[.]" *Id.* at 107:18–20, App. 0132. These are exactly the type of "unsupported generalizations about the relative interests and perspectives of men and women" that the Equal Protection Clause rejects. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984) (Court has "repeatedly condemned legal decisionmaking that relies uncritically on [sexual stereotyping].").

## B.  The Gender Quota Is Not Substantially Related to Any Important Government Objective

Even if this Court were to find that Defendant has demonstrated important governmental interests, the Gender Quota must be struck down because it is not substantially related to the achievement of those objectives. Instead, Defendant appeals to denigrating stereotypes and illusory generalities—hardly the "reasoned analysis" or "exceedingly persuasive justification" necessary to meet the exacting burden of intermediate scrutiny.[2] *See Miss. Univ. for Women*, 458 U.S. at 724.

### i.  Rigid Quotas Do Not Satisfy Intermediate Scrutiny

Intermediate scrutiny requires a scalpel not a sledgehammer. Defendant claims that there were no women elected to the State Judicial Nominating Commission by the members of the Iowa Bar until the Gender Quota was put in place, and that this justifies a "remedial interest in providing

---

[2] Defendant readily admits that despite preferencing men over women in half of *all* elected commissioner positions, the Gender Quota is not intended to remedy discrimination against men, and Defendant has never argued it is substantially related to such a purpose. *See* Gast Dep. 30:14–31:12, App. 0080–81.

women an opportunity." Hrg. Transcript, App. 0137. It does not, but even if it did, a rigid 50%

male/50% female quota is not remotely tailored to remedy such a discrepancy.

For example, Section 46.2's inflexible mechanism ignores the fact that in 1986, and prior

to the enactment of the Gender Quota, the pool of elected or appointed commissioners to the State

or District Judicial Nominating Commissions was made up of 45% women. *See* App. 0001.

Defendant's records further reveal a limited number of female candidates that ran in elections to

the State Judicial Nominating Commission.[3] App. 0002–12; *see also* Def.'s Ans. to Interrogatory

No. 8, App. 0014–15 (identifying a total of four women who sought election to the State Judicial

Nominating Commission prior to 1987).[4] It ignores *any* of the myriad factors that may have

contributed to women's choices to run or not run for election, *supra* pp. 6-7, in favor of a one-size-

fits-all approach.

Nor is this inflexible quota the only option for achieving similar rates of female

participation on judicial nominating commissions. As Defendant's expert testified, even though

"there is amazingly little information available on the population of judicial nominating

commissioners," there are seven states, all without laws requiring gender parity, with at least 50%

female participation on their state judicial nominating committees. Caufield Dep. 92:11–19, 94:8–

20, App. 0128, 0130.

---

[3] Defendant has not produced complete lists of all candidates that appeared on election ballots for the State Judicial Nominating Commission prior to the enactment of the Gender Quota. Moreover, Defendant does not possess the demographic data for all candidates and commissioners it has provided. Accordingly, neither Plaintiff nor Defendant can verify whether it is even true that a female candidate had never been elected to the State Judicial Nominating Commission prior to 1987.

[4] There may have been additional female candidates that sought election to the State Judicial Nominating Commission, but Defendant has not produced evidence to this effect. Nor has Defendant produced evidence showing the demographic breakdown of individuals who applied for the Governor-appointed positions on the Commission.

Section 46.2 does not merely utilize gender as one factor in the selection process, it makes gender the *only* factor. This is no tailoring at all; the Gender Quota sledgehammer is unconstitutional. *See Shelley v. Kraemer*, 334 U.S. 1, 22 (1948), ("Equal protection of the laws is not achieved through indiscriminate imposition of inequalities.").

### ii.      The Gender Quota's Stereotypes Are Offensive and Illegitimate

Defendant's proposed governmental interests have been forged within a cauldron of stereotypes—the fundamental one being that the Gender Quota somehow helps frail women overcome the burdens government has foisted upon them. According to Defendant's expert, the Gender Quota remains a necessary means to remedying sex-based discrimination because "women are significantly less likely to participate in political processes," and "women are less likely to speak. They spend less time speaking. They are far less likely to interrupt. They enter the conversation later." *See* Caufield Dep. 24:11–13, 45:18–22, App. 0112, 0115. This is precisely the type of "broad generalizations about the different talents, capacities, or preferences of males and females" that the Equal Protection Clause prohibits. *Virginia*, 518 U.S. at 533 (internal citation omitted).

Under the Gender Quota, women are fungible: each one is afraid to speak up, needs government assistance to win (or even enter) an election, and somehow confers "diversity" and "legitimacy" upon the state court by her presence alone. *See Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 620 (1974) (citizens are not fungible in equal protection analyses). Such stereotyping is not tailored to any important government objective because "[a]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *SFFA*, 143 S. Ct. at 2172 (citation omitted). The Equal Protection Clause rejects

14

"unsupported generalizations" that all women think or act alike, *Roberts*, 468 U.S. at 628, and the concept that people of the same sex have an identifiable "gendered" perspective is both offensive and illegitimate. *See Craig v. Boren*, 429 U.S. 190, 201 (1976) (invalidating a sex-based classification even though the evidence supporting the distinction was "not trivial in a statistical sense"); *Weinberger*, 420 U.S. at 645 (same).

The Supreme Court has made it clear that it is "completely unrealistic" to assume that groups will choose a particular occupation in lockstep proportion to their representation in the local population. *Croson*, 488 U.S. at 507. But the Gender Quota assumes just that: women make up about half of Iowa's population, so they should choose to run for seats on the Commission in the same proportion—and if they don't, the Gender Quota will make it so. *See SFFA*, 143 S. Ct. at 2165 (cleaned up) ("[I]t would be a sad day indeed, were America to become a quota-ridden society, with each identifiable minority assigned proportional representation in every desirable walk of life."). Even if Defendant had properly demonstrated past societal discrimination that prevented women from serving on the Commission, allowing this to serve as the basis for rigid preferences would shatter the dream of "a Nation of equal citizens" and it would be lost ". . . in a mosaic of shifting preferences based on inherently unmeasurable claims of past wrongs[.]" *Id.* at 2173–74. The Gender Quota's offensive, stereotypical gender assumptions are contrary to both "the letter and spirit of a constitutional provision whose central command is equality." *Id.*

### iii.    The Gender Quota Is Not Time-Limited

In addition to its other constitutional deficiencies, Section 46.2 lacks any end point whatsoever. It has remained in place for nearly forty years and applies at each and every election in perpetuity. Such a statute does not cure a purported gender imbalance, it impermissibly maintains one. *See Johnson v. Transportation Agency, Santa Clara Cnty.*, 480 U.S. 616, 630 (1987).

Defendant fails to provide any indication of when the Gender Quota's goals will be achieved or how success could be measured—implicitly asking the Court to justify the existence of a perpetual quota.[5] This request must be rejected because enshrining a permanent justification for preferences based on immutable characteristics contradicts the "core purpose of the Fourteenth Amendment" to eliminate all governmentally-imposed discrimination. *Grutter*, 539 U.S. at 341–42. Without an end date, the Gender Quota is unconstitutional. *Id*.

## CONCLUSION

In *Personnel Administrator of Mass. v. Feeney*, the Court remarked that "[c]lassifications based upon gender, not unlike those based upon race, have traditionally been the touchstone for pervasive and often subtle discrimination." 442 U.S. 256, 273 (1979) (citation omitted). There is nothing subtle about Section 46.2. It is an unconstitutional sex-based quota that bars women and men from half of the elected seats on the Commission while claiming to promote gender diversity. Plaintiff's Motion for Summary Judgment should be granted.

---

[5] The fact that the Iowa Legislature recently reviewed various statutory provisions implicating the State Judicial Nominating Commission, including the Gender Quota, and chose to keep it in place does not alleviate this constitutional defect. As the Supreme Court recently explained, periodic review cannot make "unconstitutional conduct constitutional." *SFFA*, 143 S. Ct. at 2173.

DATED:  September 1, 2023.

Respectfully submitted,

ALAN R. OSTERGREN
President and Chief Counsel
THE KIRKWOOD INSTITUTE, INC.
500 Locust Street, Suite 199
Des Moines, Iowa 50309
Telephone: (515) 207-0134
alan.ostergren@kirkwoodinstitute.org

*s/ Erin E. Wilcox*
ERIN E. WILCOX*
Cal. Bar No. 337427
JOSHUA P. THOMPSON*
Cal. Bar No. 250955
PACIFIC LEGAL FOUNDATION
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
EWilcox@pacificlegal.org
JThompson@pacificlegal.org

LAURA M. D'AGOSTINO*
D.C. Bar No. 241868
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
LDAgostino@pacificlegal.org

*Attorneys for Plaintiff*
*\* Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on September 1, 2023, I submitted the foregoing to the Clerk of the

Court via the District Court's CM/ECF system, which will provide notice of the submission of this

document to all counsel of record.

 s/ *Erin E. Wilcox*
ERIN E. WILCOX*
Cal. Bar No. 337427

*Attorney for Plaintiff*
* *Pro hac vice*
