IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| CHARLES HURLEY, | Case No. 4:22-cv-00176-SMR-SBJ |
| Plaintiff, | |
| v. | ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT |
| ROBERT GAST, in his official capacity as State Court Administrator for the Iowa Judicial Branch, | |
| Defendant. | |

This lawsuit alleges that an Iowa statute governing the election of members to a state judicial nominating commission violates the Equal Protection Clause of the Fourteenth Amendment because of its gender-balance requirement. Last year, the Court denied a request to temporarily enjoin the law's enforcement after concluding that Plaintiffs failed to satisfy the high burden to enjoin a duly-enacted statute.[1] The parties have now filed cross-motions for summary judgment. [ECF Nos. 86; 87]. For reasons set forth in this Order, Plaintiff's Motion for Summary Judgment is GRANTED and Defendant's Motion for Summary Judgment is DENIED.[2]

I. FACTUAL BACKGROUND

The history of the law at issue, codified at Iowa Code § 46.2(1), is complex. The Court refers to its prior order in this case for a full history of the statute. *See Law v. Gast*, 641 F. Supp. 3d 580 (S.D. Iowa 2022).

---

[1] This lawsuit was initiated by Plaintiffs Rachel Raak Law and Micah Broekemeier. Plaintiff Charles Hurley was later added as a party. Raak Law and Broekemeier were eventually dismissed for lack of Article III standing. The action proceeds with Hurley as the sole plaintiff.

[2] Plaintiff requested a hearing on his Motion for Summary Judgment, but the Court concludes it is unnecessary. *See* LR 7(c).

In essence, the State Judicial Nominating Commission ("the Commission") was established in 1962 to vet applicants seeking to fill the vacancies on the Iowa's appellate courts. *See* Iowa Const. art. V, §§ 15–16. The Commission is responsible for interviewing candidates and submitting names of individuals to the Governor of Iowa for a final determination on appointment. *See* Iowa Const. art. V, § 16.

The structure of the Commission has changed over time. In large part, the membership has been consistently comprised of individuals appointed by the Governor and those elected by the resident members of the Iowa State Bar Association ("ISBA"). In its current makeup, the Commission consists of seventeen members: nine appointed members and eight elected members. Iowa Code §§ 46.1–46.2 (2019). The challenged provision only pertains to this latter group of elected commissioners. Specifically, the equal protection challenge in this case centers on the gender-balance requirement in Iowa Code § 46.2(1) that mandates the elected commissioners be "of different genders," which is understood to require the election of one woman and one man in each of the four congressional districts.

The statute was part of a host of bills passed by the Iowa Legislature in the late 1980s which required a gender balance on state boards and commissions. *See, e.g.*, Iowa Code § 69.16A (mandating a gender balance on "[a]ll appointive boards, commissions, committees, and councils of the state."). Relevant to this case, the Legislature specifically addressed the lack of women elected to the Commission prior to 1987. Not a single woman was elected to the Commission until passage of the gender-balance requirement.[3]  [ECF No. 87-3 at 6–46].

---

[3] As noted in an earlier opinion, "[t]he Court reaches this conclusion based on the first names listed in the documents." *Gast*, 641 F. Supp. 3d at 589 n.1. "At the preliminary injunction hearing, parties agreed this was the best method to identify women on the Commission absent individual analysis." *Id*. The parties do not urge any different method on summary judgment.

In contrast, all women who served on the Commission prior to 1987 were appointed by the Governor. *Id*. The first woman was appointed in 1971. [ECF No. 87-3 at 14 (listing "Mrs. William Robinson" as an appointee)]. By the early 1980s, women comprised 50% of appointees. *Id*. at 32–34. By the mid-1980s, women were a significant majority of appointees. *Id*. at 41–43. Around this period, women also served in almost every type of elected position, including the Judicial Qualifications Commission, the Law Examiners Board, and the Advisory Committee on the Administration of Juvenile Court Offices. [ECF No. 87-3 at 43, 46]. In other words, between 1962 to 1987, Iowa women were appointed to the Commission and served in many other elected positions in the state, but were wholly absent from bar-elected seats on the Commission.

The exclusively male composition of elected commissioners changed in 1987 with the enactment of an amendment requiring a gender-balance. When the law was amended in 2019, the legislature retained the gender balance requirement for elected commissioners.

Plaintiff Charles Hurley is a resident of Polk County in Iowa's Third Congressional District. He previously served as Vice-Chair and Chair of the Judiciary Committee in the Iowa House of Representatives. During his legislative service, Hurley says he "routinely met with the Chief Justice of the Iowa State Supreme Court on issues confronting the state judiciary." [ECF No. 86-1 at 6]. He desires to be a candidate for the next available elective opening for the Commission in his congressional district of residence in 2025. He contends that he is otherwise qualified to run in the next election, but is excluded from participation solely due to his gender because the election is restricted to female candidates.

## II.   PROCEDURAL BACKGROUND

On May 24, 2022, this lawsuit was initiated against Defendant Robert Gast, the State Court Administrator for the Iowa Judicial Branch, in his official capacity. As the State Court

Administrator, Gast is responsible for administrating the elections for the Commission in accordance with Iowa law, including the challenged statute. Hurley seeks to prevent Gast from enforcing the statute on the grounds that it violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

On November 20, 2022, the Court denied a request for a preliminary injunction because Plaintiffs did not meet their "burden of establishing the propriety of an injunction." *Gast*, 641 F. Supp. 3d. at 605 (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). The Court expressly acknowledged the sparse evidence for the continued need for the gender-balance requirement, but ultimately concluded that the remaining factors weighed against an injunction. *Id*. at 604–05.[4]

Plaintiff filed a Motion for Summary Judgment seeking a permanent injunction against the law.[5] He argues that the law fails on both prongs of the intermediate scrutiny test. First, Hurley maintains that Defendant fails to offer sufficient evidence that the statute is supported by an important governmental interest. Second, he contends that the statute is not substantially related to the interest.

---

[4] The Court found the plaintiffs had standing in the preliminary injunction order, and the standing conclusion is appropriate here.

[5] At summary judgment, the parties also restate many of the same issues raised in their previous filings – and preliminarily resolved by the Court in its prior rulings. For example, the parties again engage in long semantic discussions, describing the law's requirement as either a quota or a balance. The underlying purpose of these discussions relates to the appropriateness of applying a heightened scrutiny to the challenged law. The Court has reviewed the parties' filings since its prior order and concludes again that Iowa Code § 46.2(1) requires individuals to identify their sex and uses that identification to determine electoral eligibility. *Gast*, 641 F. Supp. 3d at 599. This gender-based mechanism is sufficient to trigger heightened scrutiny. *Id*.; *see also Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 289 (1978) (finding "[w]hether this limitation is described as a quota or a goal, it is a line drawn on the basis of race and ethnic status."). Unless stated otherwise, the Court refers to its prior findings not inconsistent with this Order.

Defendant also moves for summary judgment. He asserts that the law is substantially related to multiple important government objectives, notably a remedial interest in ensuring that Iowa women are not disproportionately unrepresented on the Commission.

### III.    GOVERNING LAW

#### A. Motion for Summary Judgment Standard

"Summary judgment is proper if the movant 'shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *United States v. Meyer,* 914 F.3d 592, 594 (8th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986)). "If the moving party has met this burden . . . the non-moving party must set forth specific facts showing that there are genuine issues for trial." *Bankston v. Chertoff*, 460 F. Supp. 2d 1074, 1085 (D. N.D. 2006) (citations omitted).

To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element for which it has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). When considering a summary judgment motion, a court must view "evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences from that evidence in favor of the nonmoving party." *Cullor v. Baldwin*, 830 F.3d 830, 836 (8th Cir. 2016) (quoting *Smith v. URS Corp.*, 803 F.3d 964, 968 (8th Cir. 2015)). However, a court must reject an interpretation of events in favor of a party if it is blatantly contradicted by the record. *Wallingford v. Olson*, 592 F.3d 888, 892 (8th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2010)). Summary judgment is most appropriate when the "issues are primarily legal

rather than factual" in nature. *Bank of Am. Nat'l Tr. & Sav. Ass'n v. Shirley*, 96 F.3d 1108, 1111 (8th Cir. 1996).

## B. Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. This language "does not deny to States the power to treat different classes of persons in different ways." *Reed v. Reed*, 404 U.S. 71, 75 (1971) (citations omitted). Legislative classification refers to the way "laws differentiate in some fashion between" persons based on certain characteristics. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). "Unless a classification warrants some form of heightened review because it jeopardizes [the] exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." *Id*.

To survive a constitutional challenge brought pursuant to the Fourteenth Amendment, sex classifications "must bear a close and substantial relationship to important governmental objectives." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 273 (1979); *see also Craig v. Boren*, 429 U.S. 190, 197 (1976) (addressing a state law governing disparate legal drinking ages based on gender); *Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017) (invalidating a statute allowing unwed U.S.-citizen mothers to transmit citizenship to children born abroad but excepting unwed U.S.-citizen fathers). "Unless a government actor can meet the 'demanding' burden of showing an 'exceedingly persuasive' justification for treating males differently from females, the differential treatment is unconstitutional." *See D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1001 (8th Cir. 2019) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). This test is less exacting than strict scrutiny review. *H.B. Rowe Co., Inc. v. Tippett*, 615

F.3d 233, 242 (4th Cir. 2010) (citing *Clark v. Jeter*, 486 U.S. 456, 461 (1988)). When a court must determine whether a state's justification for differential treatment is sufficiently persuasive, "[t]he burden of justification is demanding and it rests entirely on the State." *See Virginia*, 518 U.S. at 533 (1996).

## IV.   ANALYSIS

To survive intermediate scrutiny, the gender balance provision must further "'important governmental objectives and the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" *D.M. by Bao Xiong*, 917 F.3d at 1002 (quoting *Virginia*, 518 U.S. at 533).

### A.  *Important Government Objectives*

Defendant identifies seven government interests that he posits are important and supports the gender balance provision:

> These include remedying past unequal election of women to the Commission; improving the quality and integrity of the Commission deliberations; fostering diversity in the merit selection process; maintaining public confidence in the selection and legitimacy of Iowa's courts; promoting better outcomes from Commission deliberations by a more diverse decision-making body; enhancing democratic legitimacy; and ensuring women do not continue to be underrepresented on the Commission.

[ECF No. 87-1 at 2–3]. Regarding the governmental interest in remedying past discrimination, the Court previously found that "Defendant has shown that Iowa Code § 46.2 was supported by a remedial interest at the time of the law's enactment." *Gast*, 641 F. Supp. 3d at 600. The Court found that Defendant presented strong evidence that women historically lacked opportunities to hold elected positions in the Commission. The Court relied on data showing "women were eligible for, interested in, and qualified to be ISBA elected members on the Commission, but did not make it that far." *Id.* at 601. Despite Plaintiff's arguments to the contrary, the Court again finds that

remedying past discrimination is an important government objective and that the gender balance provision supported, at least initially, the furtherance of that interest. *Miss. Univ. of Women v. Hogan*, 458 U.S. 718, 728 (citations omitted) (finding that, "[i]n limited circumstances, a gender-based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened.").

The Court, however, previously noted the lack of evidence showing a current remedial interest to justify the continued sex-based classification. As discussed below, the Court finds that Defendant has not sufficiently addressed these shortcomings. The Court also holds that the other proffered interests are not furthered by the law at issue.

i. Current Remedial Interest

In order "for a government actor to classify individuals based on gender for the purpose of remedying a prior lack of opportunities, the individuals *must continue* to lack opportunities or the classification is not constitutionally justified." *D.M. by Bao Xiong*, 917 F.3d at 1002 (citation omitted) (emphasis added). The evidence to support the current necessity of the gender balance provision was thin on the preliminary injunction record, as noted in the Court's order. *Gast*, 641 F. Supp. 3d at 601–02. Defendant previously relied on the current demographics of female attorneys in Iowa to show that "women still lack some opportunities to be lawyers and, relevant for the purposes of this case, be among the pool of individuals from whom ISBA representatives are always selected." *Id*. at 601. The Court found that this limited evidence "may be insufficient to continue to justify the law" because "there is no further evidence suggesting women would be underrepresented on the Commission as they were prior to the enactment of Iowa Code § 46.2 (1987)." *Id*. at 602. In response, Defendant now provides an expert opinion that adds to the general evidence of underrepresentation that women in our society undeniably continue to face today but

-8-

suggests without much more that these disparities show female commissioners in Iowa will continue to face the same or similar barriers as they did prior to 1987.[6]

Specifically, Defendant's expert, Dr. Rachel Paine Caufield, conducted a nationwide survey of the makeup of state nominating commissions. [ECF No. 87-3 at 110–113]. The information, limited to "28 jurisdictions where information concerning the individuals on the statewide nominating commissions was available," shows that nominating commissions were on average composed of 40.0% women and 60.0% men. *Id*. at 111.

The percentages, however, vary drastically state-by-state. For a quarter of states, women comprised at least fifty percent (50%) of commissioners. *Id*. Kansas has the highest percentage of women in its commission with 66.7%. *Id*. Notably, it is also "the only state in the country where the state bar controls a majority of seats." *Id*. An equal percentage of states has less than thirty percent (30%) of female commissioners. *Id*. at 112. For the remaining fifty percent (50%) of states, it is unclear based on the report the extent of the disparities between female and male commissioners. Therefore, the percentage of female commissioners for half of the states fall anywhere between 30% to 50%. Based on this survey, Dr. Caufield concludes that, "nationally, and with few exceptions, women remain under-represented in this important role." *Id*.

It is clear from these data points that the percentages of women in most judicial nominating commissions do not reflect the proportion of women in the general population. In Iowa, women

---

[6] Defendant also states, "the State's other interests remain just as important today as they were in 1987." [ECF No. 87-1 at 3]. Defendant's other interests are, by their very nature, permanent fixtures of our democratic government and will remain as eternal aspirations of any free society. The inquiry into the current *remedial* interest of the law, however, does not turn on the importance of those other interests. Instead, this inquiry is related to the government's first interest: remedying past discrimination. If no current remedial interest exists, the government is prohibited from remedying past discrimination by classifying individuals based on their gender. *D.M. by Bao Xiong*, 917 F.3d at 1002 (citation omitted).

consistently represented around 50% of the total population from 1962 to present day. [ECF No. 87-2 at 3]. These percentages are similarly reflected nationwide. It is, therefore, somewhat probative to the issues in this case to highlight any patterns of disparities that may be found in the different state nominating commissions. However, a flaw in the methodology of this comparative survey presents a challenge for the Court to draw any meaningful conclusions and is ultimately insufficient to show a "exceedingly persuasive justification" for the continued sex-based classification of the statute. *D.M. by Bao Xiong*, 917 F.3d at 1002.

Specifically, there are too many variables in the survey. Dr. Caufield acknowledges that, "[c]ategorizing state judicial selections systems is difficult because there are so many variations on each method of selection that can be idiosyncratic and unique to the state." [ECF No. 87-3 at 111]. She further explains:

> Systems of judicial selection vary by state, the type of vacancy, *the makeup of the nominating commission*, the level of court, confirmation requirements, the governor's authority, and the method of retention. In addition, state laws regarding these requirements are frequently changing, which yields an amazingly diverse array of state systems. *This can make it difficult to directly compare any two state systems, though a number of organizations have attempted to identify similarities and categorize systems based upon these features*.

*Id*. (emphasis added). In an effort to do the same, Dr. Caufield focused her report on the "makeup of nominating commissions" by looking at available data in a digital encyclopedia known as Ballotpedia. *Id*. Her nationwide survey reflects her findings. The problem, however, is the possibility of a multitude of variables, both known and unknown, that may contribute to the makeup of any individual nominating commission that, based on Dr. Caufield's own descriptions, do not exist in the other commissions.

For example, Iowa law does not require state nominating commissioners be lawyers. Put another way, the pool of eligible applicants to the Iowa state nominating commission, in

theory, extends to the general population. *See* Iowa Code § 48A(5). Therefore, the complete absence of women on the Commission prior to 1987 is particularly glaring when taking into account the potential pool of eligible women in the state. It is unclear based on Dr. Caufield's report whether the same situation exists in other states. The Court can only speculate on the eligibility requirements in other states or the impact of those requirements on the percentages of women in judicial nominating commissions. Therefore, the makeup of a commission that requires eligible applicants be lawyers may actually reflect the proportion of female attorneys in the state, even if women are still underrepresented compared to the general population. In that case, any disparities that do exist may be because women are underrepresented in the legal profession, not necessarily in the nominating commission itself.

This is not to say it is desirable, or even possible, to reduce all variables in a comparative study. Rather, it is an unavoidable conclusion that there are simply too many variables among this pool of state nominating commissions to establish meaningful conclusions, sufficient to support the argument for the current necessity of the challenged Iowa law. *D.M. by Bao Xiong*, 917 F.3d at 1002 n.2.

A similar issue exists in other conclusions in Dr. Caufield's report. She explains that state nominating commissions in merit selection systems are categorized into three groups: governor-controlled, bar-controlled, or hybrid. [ECF No. 87-3 at 112]. The grouping is "based upon how seats are divided among those responsible for selecting individuals to serve on the commission." *Id*. For example, Iowa's state nominating commission is classified as governor-controlled because a majority of seats in the Commission are appointed by the Governor. *Id*. Dr. Caufield uses this information to note that the average percentage of women in governor-controlled commissions is only 38.2%. *Id*. In comparison, the Commission in Iowa has 47.1% women, a data point which

she attributes to the statute. However, this comparison with other governor-controlled commissions to support the current necessity of the law is again weakened by the multitude of variables and the unique features of each state's nominating commission.

The idiosyncrasy of each state's judicial appointment process is reflected in Iowa's own history. Prior to 1962, Iowans selected their state court judges through partisan elections. This changed in 1962 with the ratification of constitutional amendments altering the State's judicial selection method to an appointment process. *See* Iowa Const. art. V, §§ 15–16. Under the new process, the Commission was established. The initial composition of the Commission included fifteen members: seven governor-appointed members, seven bar-elected members, and a senior justice of the Iowa Supreme Court, other than the chief justice. *Id*. The first ISBA election occurred shortly afterwards in 1962 and no woman was elected by the ISBA until 1987. [ECF No. 87-3 at 6–46]. This disparity, however, was not present in the appointees. In fact, by the mid-1980s, the large majority of appointed commissioners were women. *Id*. at 41–43.

By Defendant's own proffered metrics, Iowa state nominating commission at the time would have been categorized as a hybrid system. Iowa is now considered a governor-controlled commission because a 2019 amendment altered the commission structure to give the appointed commissioners a simple majority. Put another way, the Iowa commission is only categorized as a governor-controlled commission because nine of the members are appointed by the Governor, as opposed to the eight members elected by the ISBA. It is unknown based on the report whether other governor-controlled commissions are similarly structured. There may be no elected positions among the other governor-controlled commissions. It is, therefore, illogical to compare Iowa's system with those other states, especially in light of Iowa's unique history whereby the Governor of Iowa traditionally appointed a significant number of women to the Commission.

It is equally inapposite to focus on governor-controlled commissions as a metric when the statute at issue in this case only pertains to elected members. While the commission makeup in Kansas with 66.7% women may be an outlier, it is more logical for the purposes of determining the continued necessity of Iowa Code § 46.2(1) to compare the elected commissioners of Iowa with that of Kansas, where the majority of seats are controlled by the state bar. *Id*. at 111. The situation in Kansas undermines Defendant's argument that Iowa women face the same or similar barriers in the Commission today as they did prior to the enactment of Iowa Code § 46.2(1). In fact, the Kansas system even suggests that the Iowa requirement mandating a gender balance prevents some women from sitting in the Commission. [ECF No. 86-5 at 78 (Gast testifying that Iowa Code § 46.2(1) prevents "two women from serving at any time in any of the congressional districts.")].

Put simply, Defendant did not sufficiently establish that the remedial measure is currently necessary in Iowa to remedy past discrimination that prohibited all women from election to the Commission. This is not to say that gender discrimination does not exist—it plainly does across the spectrum of jobs in this country—but the evidence presented to the Court does not establish this fact in this Commission, in this state, at this time. Evidence of gender-based disparities or discrimination in other states, with their own unique judicial selection systems, is insufficient to justify a state action in Iowa that prohibits men from running in certain elections to the Commission and, notably, *also* discriminates against women from running in other elections. *See D.M. by Bao Xiong*, 917 F.3d at 1002 n.2 (stating that, "the alleged fact that girls are underrepresented in sports nationwide does not address the question of whether girls are underrepresented in Minnesota so as to justify a bylaw that prohibits boys from joining high school competitive dance teams in that state.").

In his own deposition, Defendant stated he is not aware of any female lawyer who faced barriers or discrimination when seeking election to the Commission. [ECF No. 86-5 at 80–81]. The entire summary judgment record is equally inconclusive to the current situation for Iowa women in the general population or among those in the legal field. In light of this sparse evidence, the Court can only conclude that there is no current remedial interest in Iowa Code § 46.2(1) to justify a sex-based classification that is presumptively invalid. Thus, the first prong of the intermediate scrutiny test for the first of the government's stated goals is not satisfied.

ii. Other Government Interests

The parties also dispute whether the government's other purported interests are furthered by the Iowa Code § 46.2(1). Those other interests include "improv[ing] the quality and integrity of the Commission deliberations," diversifying the merit selection process, fostering public confidence and legitimacy of the state judiciary, "promot[ing] better outcomes from Commission deliberations due to a more diverse decision-making body," strengthening democratic legitimacy, and "ensur[ing] equal representation of all Iowans in judicial selection for our appellate courts." [ECF No. 87-2 at 6]. For reasons discussed below, the Court finds that Defendant has not established the implementing law furthers these stated goals.

It cannot be denied that these interests are independently important to the state. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 445 (2015) (citations omitted) (recognizing the "'vital state interest' in safeguarding 'public confidence in the fairness and integrity of the nation's elected judges.'"). The government has a particular interest in preserving public confidence in the integrity of the judiciary because, unlike other branches of the government, it "has no influence over either the sword or the purse" and thus largely relies upon "the public's willingness to respect

and follow its decisions." *Id*. at 445–46. It logically follows that the vital state interest in judicial integrity extends to the processes by which judges are selected.

The inquiry, however, does not stop there. The government must show "at least that the challenged classification serves important governmental objectives, and that the discriminatory means employed are substantially related to the achievement of those objectives." *D.M. by Bao Xiong*, 917 F.3d at 1002 (citing *Virginia*, 518 U.S. at 533) (cleaned up). "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Virginia*, 518 U.S. at 533. "And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id*. In this case, it is unclear how the gender-based classification of Iowa Code § 46.2 furthers any of the purported government interests. Instead, it appears Defendant's evidence of a relationship between the classification and the list of purported state interest "is connected . . . only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

For example, Defendant maintains that the sex-based classification fosters diversity in the merit selection process. Plaintiff argues that fostering diversity by itself "has never been recognized an as important governmental interest." [ECF No. 34 at 45]. The Court does not find support for Plaintiff's bold proposition. *See Lutheran Church–Mo. Synod v. FCC*, 141 F.3d 344, 354 (D.C. Cir. 1998) (finding that, while diversity has previously been found to be "important," it does not rise to the level of "compelling"); *see also Tippett*, 615 F.3d at 242 (citing *Jeter*, 486 U.S. at 461). The Court, however, raises concern that the purported government interest in diversifying the merit selection process relies on overbroad generalizations about women, specifically about their decision making. Defendant's argument by implication relies on an assumption that women by virtue of their sex are likely to promote decisions that diversify the judiciary. This assumption

is not supported by the record. [ECF No. 86-5 at 135 (Dr. Caufield confirming "it's not clear whether Iowa's system results in a more diverse judiciary.")]. As described in greater detail below, the Court ultimately finds that the relationship between the classification and the purported government interests is too tenuous to say that one furthers or is substantially related to the other.

### iii. Summary

While Iowa Code § 46.2 was supported by a remedial interest at the time of its enactment, evidence of the current necessity of the law at question is insufficient to justify the discrimination against men—*and women*—in elections to the Commission. In addition, the government's other purported interests may be important but are likewise insufficient to survive intermediate scrutiny given the attenuated link between Iowa Code § 46.2 and the government's interests.

### B. *Tailoring*

The parties dispute whether Iowa Code § 46.2(1) is substantially related to the government's stated goals in this case. Plaintiff argues that "the discriminatory method employed to achieve those objectives is a rigid, never-ending quota that relies on offensive and illegitimate stereotypes." [ECF No. 86 at 2]. Defendant maintains that the classification is tailored to the government's important interests, stating that "section 46.2 only requires gender balance, not racial balance—*and it aimed to remedy* women being completely excluded from the commission in practice (despite being technically eligible to run) for the first twenty-five years of its existence." [ECF No. 87-1 at 14]. The Court previously found based on information at the time that "the law is substantially tailored to the remedial need and lacks a gender-neutral alternative." *Gast*, 641 F. Supp. 3d at 602. With the full summary judgment record, the Court now must conclude that the law is not substantially related to the government's proffered interests.

i. Fit Between Stated Goal and Implemented Law

The Supreme Court has held in the past that it is not *per se* unjustifiable for a gender-based classification to intentionally and directly assist members of a disproportionately burdened sex. *Miss. Univ.*, 458 U.S. at 728 (citation omitted); *Califano v. Webster*, 430 U.S. 313, 318 (1977) (upholding a federal retirement statute that "operated directly to compensate women for past economic discrimination."). When a court considers the "substantially related" element in a remedial plan, the key inquiry is whether the plan, as applied, furthers the stated goal. *Danskine v. Miami Dade Fire Dep't*, 253 F.3d 1288, 1294 (11th Cir. 2001). A law is not substantially related if it does not make meaningful progress towards the expressly desired outcome. *Califano v. Westcott*, 443 U.S. 76, 88 (1979); *Caban v. Mohammed*, 441 U.S. 380, 391 (1979). The intermediate scrutiny standard "does not require that there be no other way to accomplish the objectives." *Cohen v. Brown Univ.*, 101 F.3d 155, 184 (1st Cir. 1996). It merely requires the "chosen tool [be] carefully aimed at the problem, not fired indiscriminately with grave risk of collateral damage." *Franklin v. United States*, 49 F.4th 429, 438 (5th Cir. 2022).

As written and implemented, the law was appropriately tailored to address the complete absence of women elected by the ISBA. *Gast*, 641 F. Supp. 3d at 603. However, as there is sparse evidence for the current necessity of the challenge law, the Court cannot say that sex-based classification is "carefully aimed at the problem" of remedying *current* discrimination against Iowa women wishing to serve on the Commission. *Franklin*, 49 F.4th at 438. As the burden rests entirely on Defendant to show otherwise, the remedial measure is not tailored to the classification.

The Court also finds the government's other stated goals and the challenged law are not substantially related. In his summary judgment motion, Defendant rests his argument on expert's opinion to show that the law is appropriately tailored. Specifically, Dr. Caufield cites to empirical

research indicating that gender diversity in political decision-making affects public confidence and legitimacy of the deliberations.  [ECF No. 87-3 at 113–15].  She also points to research that suggests certain gender norms, such higher rates of imposter syndrome among women, "may stymie women's propensity to seek or occupy leadership positions, verbally express themselves or pursue professional promotions."  *Id*. at 114.  She added that the "the quality and tenor of deliberation changes based upon the number of women who are in the group" because, for example, women are more likely to be negatively interrupted by men when they are in the minority.  *Id*. at 115.

These studies are profound and highlight the unfortunate reality for many women in the workforce but they do not sufficiently relate to the statute at issue here for constitutional tailoring purposes.  Defendant has not introduced any evidence linking these studies to the Commission.  As Dr. Caufield noted, her analysis "does not necessarily speak to the specific operation of judicial nominating commissions."  *Id*. at 86.  The sex-based classification fails in the absence of this connection.  *See Boren*, 429 U.S. at 204 (finding the relationship between the statute and the stated goal was "far too tenuous" to satisfy the second prong of the intermediate scrutiny test).

### ii.  Summary

Iowa Code § 46.2 was appropriately enacted to address the absolute absence of women serving in ISBA elected positions on a Commission.  At its inception, the statute was substantially related to the stated goal of remedying past discrimination.  However, the Court cannot find the law is substantially related to any *current* discrimination, nor can the Court find that the law is tailored to accomplish any of the government's other stated objectives.  Therefore, the Court must find that Iowa Code § 46.2 does not survive intermediate scrutiny.

V. CONCLUSION

Defendant states that "[e]ven if it would be appropriate to end the gender-balance requirement someday, today is not that day." [ECF No. 87-1 at 3]. That may be the case. However, the government has the sole burden to show that the sex-based classification, a presumptively invalid state action, survives heightened scrutiny. It has not done so. Presented with limited evidence, the Court must find that Iowa Code § 46.2(1) is a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Therefore, Plaintiff's Motion for Summary Judgment is GRANTED and Defendant's Motion for Summary Judgment is DENIED. [ECF Nos. 86; 87].

Under Federal Rule of Civil Procedure 65(d), every order granting an injunction "must . . . state its terms specifically . . . and describe in reasonable detail . . . the act or acts restrained." Fed. R. Civ. P. 65(d)(1)(B–C). The scope of the permanent injunction is defined as follows:

1. **IT IS ORDERED** that Defendant is permanently enjoined from enforcement of Iowa Code § 46.2(1) effective immediately. He may not enforce the gender-based requirement in any capacity or through any instrumentality available to him.

2. **IT IS FURTHER ORDERED** that Defendant shall immediately issue a written notice to all employees in the state who are involved in enforcing Iowa Code § 46.2(1) or have oversight of such enforcement and notify them of the permanent injunction prohibiting enforcement of the ordinances.

3. **IT IS FURTHER ORDERED** that Defendant shall demonstrate his compliance with the Order by submitting an affidavit detailing its efforts to the Court within ten (10) days of entry of this Order.

IT IS SO ORDERED.

Dated this 11th day of January, 2024.

_____
STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT